ROMER, GOVERNOR OF COLORADO, ET AL. *v.*
EVANS ET AL.

No. 94–1039.   Argued October 10, 1995—Decided May 20, 1996

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 636.

*Timothy M. Tymkovich,* Solicitor General of Colorado, argued the cause for petitioners. With him on the briefs were *Gale A. Norton,* Attorney General, *Stephen K. ErkenBrack,* Chief Deputy Attorney General, *John Daniel Dailey* and *Paul Farley,* Deputy Attorneys General, and *Rex E. Lee* and *Carter G. Phillips,* Special Assistant Attorneys General.

*Jean E. Dubofsky* argued the cause for respondents. With her on the brief for respondents Evans et al. were *Rod-*

erick M. Hills, Jr., Matthew Coles, Steven R. Shapiro, Clyde J. Wadsworth, Suzanne B. Goldberg, Jeanne Winer, Gregory A. Eurich, David H. Miller, Darlene M. Ebert, Joseph N. de Raismes III, and Walter A. Smith, Jr. John P. Worcester and Edward M. Caswall filed a brief for respondents City of Aspen et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Charles J. Cooper*, and by the Attorneys General for their respective States as follows: *Jeff Sessions* of Alabama, *Daniel E. Lungren* of California, *Alan G. Lance* of Idaho, *Don Stenberg* of Nebraska, *Charles Molony Condon* of South Carolina, *Mark Barnett* of South Dakota, and *James S. Gilmore III* of Virginia; for the American Center for Law and Justice Family Life Project by *Jay Alan Sekulow* and *Keith A. Fournier;* for the Christian Legal Society et al. by *Steven T. McFarland, Samuel B. Casey, Gregory S. Baylor*, and *John K. Hulston Hall;* for Colorado for Family Values by *Robert K. Skolrood;* for Concerned Women for America, Inc., by *David J. Myers* and *Wendell R. Bird;* for Equal Rights, Not Special Rights, Inc., by *Michael A. Carvin, William L. McGrath*, and *Robert H. Bork;* for the Family Research Council by *Melissa Wells-Petry;* for the Pacific Legal Foundation by *Anthony T. Caso* and *Deborah J. La Fetra;* and for the Oregon Citizens Alliance et al. by *Lawrence J. Hall.*

Briefs of *amici curiae* urging affirmance were filed for the State of Oregon et al. by *Theodore R. Kulongoski*, Attorney General of Oregon, *Thomas A. Balmer*, Deputy Attorney General, *Virginia L. Linder*, Solicitor General, *Michael D. Reynolds*, Assistant Solicitor General, and *Rives Kistler*, Assistant Attorney General, *Thomas J. Miller*, Attorney General of Iowa, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Scott Harshbarger*, Attorney General of Massachusetts, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Frankie Sue Del Papa*, Attorney General of Nevada, *Christine O. Gregoire*, Attorney General of Washington, and *Garland Pinkston, Jr.*, Acting Corporation Counsel of the District of Columbia; for the City of Atlanta et al. by *Louise H. Renne, Dennis Aftergut, Burk E. Delventhal, Julia M. C. Friedlander, Mary Carole Cooney, Robin Joy Shahar, Neal M. Janey, Stephen H. Clark, James K. Hahn, David I. Schulman, Eunice Gibson, Paul A. Crotty, Leonard A. Kerner, Jeffrey L. Rogers, Linda Meng, Janet E. Halley, Mark H. Sidran, Henry W. Underhill, Jr.*, and *Susan S. Sher;* for Affirmation: United Methodists for Gay, Lesbian and Bisexual Concerns et al. by *Celeste McCollough;* for the American Bar Association by *George E. Bushnell, Jr.;* for the American Association on Mental Retardation et al. by *James W. Ellis* and *Maureen A. Sanders;* for The American Federation of State, County and

JUSTICE KENNEDY delivered the opinion of the Court.

One century ago, the first Justice Harlan admonished this Court that the Constitution "neither knows nor tolerates classes among citizens." *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (dissenting opinion). Unheeded then, those words now are understood to state a commitment to the law's neutrality where the rights of persons are at stake. The Equal Protection Clause enforces this principle and today requires us to hold invalid a provision of Colorado's Constitution.

I

The enactment challenged in this case is an amendment to the Constitution of the State of Colorado, adopted in a 1992 statewide referendum. The parties and the state courts refer to it as "Amendment 2," its designation when submitted to the voters. The impetus for the amendment and the contentious campaign that preceded its adoption came in large part from ordinances that had been passed in various Colorado municipalities. For example, the cities of Aspen and Boulder and the city and County of Denver each had

Municipal Employees, AFL–CIO, by *John C. Dempsey* and *Larry P. Weinberg;* for the American Friends Service Committee et al. by *Stark Ritchie;* for the American Psychological Association et al. by *Paul M. Smith, James L. McHugh, Jr.,* and *Richard G. Taranto;* for the Asian American Legal Defense and Education Fund et al. by *Eben Moglen* and *Pamela S. Karlan;* for the Colorado Bar Association et al. by *Stephen V. Bomse, Martha Minow,* and *Frances A. Koncilja;* for the Gay and Lesbian Lawyers of Philadelphia by *Cletus P. Lyman;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Eric Schnapper, Elaine R. Jones, Theodore M. Shaw, Antonia Hernandez, Judith L. Lichtman,* and *Donna R. Lenhoff;* for the National Bar Association by *J. Clay Smith, Jr.;* for the National Education Association et al. by *Robert H. Chanin* and *John M. West;* for James E. Andrews by *Eric J. Graninger;* and for Laurence H. Tribe et al. by *Mr. Tribe, pro se, John Hart Ely, pro se, Philip B. Kurland, pro se,* and *Kathleen M. Sullivan, pro se.*

*Chai R. Feldblum* filed a brief for the Human Rights Campaign Fund et al. as *amici curiae.*

enacted ordinances which banned discrimination in many transactions and activities, including housing, employment, education, public accommodations, and health and welfare services. Denver Rev. Municipal Code, Art. IV, §§ 28–91 to 28–116 (1991); Aspen Municipal Code § 13–98 (1977); Boulder Rev. Code §§ 12–1–1 to 12–1–11 (1987). What gave rise to the statewide controversy was the protection the ordinances afforded to persons discriminated against by reason of their sexual orientation. See Boulder Rev. Code § 12–1–1 (defining "sexual orientation" as "the choice of sexual partners, i. e., bisexual, homosexual or heterosexual"); Denver Rev. Municipal Code, Art. IV, § 28–92 (defining "sexual orientation" as "[t]he status of an individual as to his or her heterosexuality, homosexuality or bisexuality"). Amendment 2 repeals these ordinances to the extent they prohibit discrimination on the basis of "homosexual, lesbian or bisexual orientation, conduct, practices or relationships." Colo. Const., Art. II, § 30b.

Yet Amendment 2, in explicit terms, does more than repeal or rescind these provisions. It prohibits all legislative, executive or judicial action at any level of state or local government designed to protect the named class, a class we shall refer to as homosexual persons or gays and lesbians. The amendment reads:

> "No Protected Status Based on Homosexual, Lesbian or Bisexual Orientation. Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status, quota preferences, protected status or claim of discrimination. This Section of the Constitution shall be in all respects self-executing." *Ibid.*

Soon after Amendment 2 was adopted, this litigation to declare its invalidity and enjoin its enforcement was commenced in the District Court for the City and County of Denver. Among the plaintiffs (respondents here) were homosexual persons, some of them government employees. They alleged that enforcement of Amendment 2 would subject them to immediate and substantial risk of discrimination on the basis of their sexual orientation. Other plaintiffs (also respondents here) included the three municipalities whose ordinances we have cited and certain other governmental entities which had acted earlier to protect homosexuals from discrimination but would be prevented by Amendment 2 from continuing to do so. Although Governor Romer had been on record opposing the adoption of Amendment 2, he was named in his official capacity as a defendant, together with the Colorado Attorney General and the State of Colorado.

The trial court granted a preliminary injunction to stay enforcement of Amendment 2, and an appeal was taken to the Supreme Court of Colorado. Sustaining the interim injunction and remanding the case for further proceedings, the State Supreme Court held that Amendment 2 was subject to strict scrutiny under the Fourteenth Amendment because it infringed the fundamental right of gays and lesbians to participate in the political process. *Evans* v. *Romer*, 854 P. 2d 1270 (Colo. 1993) *(Evans I)*. To reach this conclusion, the state court relied on our voting rights cases, *e. g., Reynolds* v. *Sims*, 377 U. S. 533 (1964); *Carrington* v. *Rash*, 380 U. S. 89 (1965); *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966); *Williams* v. *Rhodes*, 393 U. S. 23 (1968), and on our precedents involving discriminatory restructuring of governmental decisionmaking, see, *e. g., Hunter* v. *Erickson*, 393 U. S. 385 (1969); *Reitman* v. *Mulkey*, 387 U. S. 369 (1967); *Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457 (1982); *Gordon* v. *Lance*, 403 U. S. 1 (1971). On remand, the State advanced various arguments in an effort to show that

Amendment 2 was narrowly tailored to serve compelling interests, but the trial court found none sufficient. It enjoined enforcement of Amendment 2, and the Supreme Court of Colorado, in a second opinion, affirmed the ruling. 882 P. 2d 1335 (1994) *(Evans II)*. We granted certiorari, 513 U. S. 1146 (1995), and now affirm the judgment, but on a rationale different from that adopted by the State Supreme Court.

## II

The State's principal argument in defense of Amendment 2 is that it puts gays and lesbians in the same position as all other persons. So, the State says, the measure does no more than deny homosexuals special rights. This reading of the amendment's language is implausible. We rely not upon our own interpretation of the amendment but upon the authoritative construction of Colorado's Supreme Court. The state court, deeming it unnecessary to determine the full extent of the amendment's reach, found it invalid even on a modest reading of its implications. The critical discussion of the amendment, set out in *Evans I,* is as follows:

> "The immediate objective of Amendment 2 is, at a minimum, to repeal existing statutes, regulations, ordinances, and policies of state and local entities that barred discrimination based on sexual orientation. *See* Aspen, Colo., Mun. Code § 13–98 (1977) (prohibiting discrimination in employment, housing and public accommodations on the basis of sexual orientation); Boulder, Colo., Rev. Code §§ 12–1–2 to –4 (1987) (same); Denver, Colo., Rev. Mun. Code art. IV, §§ 28–91 to –116 (1991) (same); Executive Order No. D0035 (December 10, 1990) (prohibiting employment discrimination for 'all state employees, classified and exempt' on the basis of sexual orientation); Colorado Insurance Code, § 10–3–1104, 4A C. R. S. (1992 Supp.) (forbidding health insurance providers from determining insurability and premiums based on an applicant's, a beneficiary's, or an insured's

sexual orientation); and various provisions prohibiting discrimination based on sexual orientation at state colleges.[26]

"[26]Metropolitan State College of Denver prohibits college sponsored social clubs from discriminating in membership on the basis of sexual orientation and Colorado State University has an antidiscrimination policy which encompasses sexual orientation.

"The 'ultimate effect' of Amendment 2 is to prohibit any governmental entity from adopting similar, or more protective statutes, regulations, ordinances, or policies in the future unless the state constitution is first amended to permit such measures." 854 P. 2d, at 1284–1285, and n. 26.

Sweeping and comprehensive is the change in legal status effected by this law. So much is evident from the ordinances the Colorado Supreme Court declared would be void by operation of Amendment 2. Homosexuals, by state decree, are put in a solitary class with respect to transactions and relations in both the private and governmental spheres. The amendment withdraws from homosexuals, but no others, specific legal protection from the injuries caused by discrimination, and it forbids reinstatement of these laws and policies.

The change Amendment 2 works in the legal status of gays and lesbians in the private sphere is far reaching, both on its own terms and when considered in light of the structure and operation of modern antidiscrimination laws. That structure is well illustrated by contemporary statutes and ordinances prohibiting discrimination by providers of public accommodations. "At common law, innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 571 (1995). The duty was a general one and did not specify protection for particular groups. The common-law rules, however, proved

insufficient in many instances, and it was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations, *Civil Rights Cases*, 109 U. S. 3, 25 (1883). In consequence, most States have chosen to counter discrimination by enacting detailed statutory schemes. See, *e. g.*, S. D. Codified Laws §§ 20–13–10, 20–13–22, 20–13–23 (1995); Iowa Code §§ 216.6–216.8 (1994); Okla. Stat., Tit. 25, §§ 1302, 1402 (1987); 43 Pa. Cons. Stat. §§ 953, 955 (Supp. 1995); N. J. Stat. Ann. §§ 10:5–3, 10:5–4 (West Supp. 1995); N. H. Rev. Stat. Ann. §§ 354–A:7, 354–A:10, 354–A:17 (1995); Minn. Stat. § 363.03 (1991 and Supp. 1995).

Colorado's state and municipal laws typify this emerging tradition of statutory protection and follow a consistent pattern. The laws first enumerate the persons or entities subject to a duty not to discriminate. The list goes well beyond the entities covered by the common law. The Boulder ordinance, for example, has a comprehensive definition of entities deemed places of "public accommodation." They include "any place of business engaged in any sales to the general public and any place that offers services, facilities, privileges, or advantages to the general public or that receives financial support through solicitation of the general public or through governmental subsidy of any kind." Boulder Rev. Code § 12–1–1(j) (1987). The Denver ordinance is of similar breadth, applying, for example, to hotels, restaurants, hospitals, dental clinics, theaters, banks, common carriers, travel and insurance agencies, and "shops and stores dealing with goods or services of any kind," Denver Rev. Municipal Code, Art. IV, § 28–92 (1991).

These statutes and ordinances also depart from the common law by enumerating the groups or persons within their ambit of protection. Enumeration is the essential device used to make the duty not to discriminate concrete and to provide guidance for those who must comply. In following this approach, Colorado's state and local governments have

not limited antidiscrimination laws to groups that have so far been given the protection of heightened equal protection scrutiny under our cases. See, *e. g.*, *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 135 (1994) (sex); *Lalli* v. *Lalli*, 439 U. S. 259, 265 (1978) (illegitimacy); *McLaughlin* v. *Florida*, 379 U. S. 184, 191–192 (1964) (race); *Oyama* v. *California*, 332 U. S. 633 (1948) (ancestry). Rather, they set forth an extensive catalog of traits which cannot be the basis for discrimination, including age, military status, marital status, pregnancy, parenthood, custody of a minor child, political affiliation, physical or mental disability of an individual or of his or her associates—and, in recent times, sexual orientation. Aspen Municipal Code § 13–98(a)(1) (1977); Boulder Rev. Code §§ 12–1–1 to 12–1–4 (1987); Denver Rev. Municipal Code, Art. IV, §§ 28–92 to 28–119 (1991); Colo. Rev. Stat. §§ 24–34–401 to 24–34–707 (1988 and Supp. 1995).

Amendment 2 bars homosexuals from securing protection against the injuries that these public-accommodations laws address. That in itself is a severe consequence, but there is more. Amendment 2, in addition, nullifies specific legal protections for this targeted class in all transactions in housing, sale of real estate, insurance, health and welfare services, private education, and employment. See, *e. g.*, Aspen Municipal Code §§ 13–98(b), (c) (1977); Boulder Rev. Code §§ 12–1–2, 12–1–3 (1987); Denver Rev. Municipal Code, Art. IV, §§ 28–93 to 28–95, 28–97 (1991).

Not confined to the private sphere, Amendment 2 also operates to repeal and forbid all laws or policies providing specific protection for gays or lesbians from discrimination by every level of Colorado government. The State Supreme Court cited two examples of protections in the governmental sphere that are now rescinded and may not be reintroduced. The first is Colorado Executive Order D0035 (1990), which forbids employment discrimination against "'all state employees, classified and exempt' on the basis of sexual orientation." 854 P. 2d, at 1284. Also repealed, and now forbid-

den, are "various provisions prohibiting discrimination based on sexual orientation at state colleges." *Id.,* at 1284, 1285. The repeal of these measures and the prohibition against their future reenactment demonstrate that Amendment 2 has the same force and effect in Colorado's governmental sector as it does elsewhere and that it applies to policies as well as ordinary legislation.

Amendment 2's reach may not be limited to specific laws passed for the benefit of gays and lesbians. It is a fair, if not necessary, inference from the broad language of the amendment that it deprives gays and lesbians even of the protection of general laws and policies that prohibit arbitrary discrimination in governmental and private settings. See, *e. g.,* Colo. Rev. Stat. § 24-4-106(7) (1988) (agency action subject to judicial review under arbitrary and capricious standard); § 18-8-405 (making it a criminal offense for a public servant knowingly, arbitrarily, or capriciously to refrain from performing a duty imposed on him by law); § 10-3-1104(1)(f) (prohibiting "unfair discrimination" in insurance); 4 Colo. Code of Regulations 801-1, Policy 11-1 (1983) (prohibiting discrimination in state employment on grounds of specified traits or "other non-merit factor"). At some point in the systematic administration of these laws, an official must determine whether homosexuality is an arbitrary and, thus, forbidden basis for decision. Yet a decision to that effect would itself amount to a policy prohibiting discrimination on the basis of homosexuality, and so would appear to be no more valid under Amendment 2 than the specific prohibitions against discrimination the state court held invalid.

If this consequence follows from Amendment 2, as its broad language suggests, it would compound the constitutional difficulties the law creates. The state court did not decide whether the amendment has this effect, however, and neither need we. In the course of rejecting the argument that Amendment 2 is intended to conserve resources to fight discrimination against suspect classes, the Colorado Su-

preme Court made the limited observation that the amendment is not intended to affect many antidiscrimination laws protecting nonsuspect classes, *Romer II*, 882 P. 2d, at 1346, n. 9. In our view that does not resolve the issue. In any event, even if, as we doubt, homosexuals could find some safe harbor in laws of general application, we cannot accept the view that Amendment 2's prohibition on specific legal protections does no more than deprive homosexuals of special rights. To the contrary, the amendment imposes a special disability upon those persons alone. Homosexuals are forbidden the safeguards that others enjoy or may seek without constraint. They can obtain specific protection against discrimination only by enlisting the citizenry of Colorado to amend the State Constitution or perhaps, on the State's view, by trying to pass helpful laws of general applicability. This is so no matter how local or discrete the harm, no matter how public and widespread the injury. We find nothing special in the protections Amendment 2 withholds. These are protections taken for granted by most people either because they already have them or do not need them; these are protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society.

## III

The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 271–272 (1979); *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920). We have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end. See, *e. g.*, *Heller* v. *Doe*, 509 U. S. 312, 319–320 (1993).

Amendment 2 fails, indeed defies, even this conventional inquiry. First, the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation. Second, its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests.

Taking the first point, even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority. In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous. See *New Orleans* v. *Dukes*, 427 U. S. 297 (1976) (tourism benefits justified classification favoring pushcart vendors of certain longevity); *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483 (1955) (assumed health concerns justified law favoring optometrists over opticians); *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106 (1949) (potential traffic hazards justified exemption of vehicles advertising the owner's products from general advertising ban); *Kotch* v. *Board of River Port Pilot Comm'rs for Port of New Orleans*, 330 U. S. 552 (1947) (licensing scheme that disfavored persons unrelated to current river boat pilots justified by possible efficiency and safety benefits of a closely knit pilotage system). The laws challenged in the cases just cited were narrow enough in scope and grounded in a sufficient factual context for us to

ascertain some relation between the classification and the purpose it served. By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law. See *Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 181 (1980) (STEVENS, J., concurring) ("If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect").

Amendment 2 confounds this normal process of judicial review. It is at once too narrow and too broad. It identifies persons by a single trait and then denies them protection across the board. The resulting disqualification of a class of persons from the right to seek specific protection from the law is unprecedented in our jurisprudence. The absence of precedent for Amendment 2 is itself instructive; "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Louisville Gas & Elec. Co.* v. *Coleman,* 277 U. S. 32, 37–38 (1928).

It is not within our constitutional tradition to enact laws of this sort. Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance. "'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'" *Sweatt* v. *Painter,* 339 U. S. 629, 635 (1950) (quoting *Shelley* v. *Kraemer,* 334 U. S. 1, 22 (1948)). Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws

is a pledge of the protection of equal laws.'" *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942) (quoting *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886)).

*Davis* v. *Beason,* 133 U. S. 333 (1890), not cited by the parties but relied upon by the dissent, is not evidence that Amendment 2 is within our constitutional tradition, and any reliance upon it as authority for sustaining the amendment is misplaced. In *Davis,* the Court approved an Idaho territorial statute denying Mormons, polygamists, and advocates of polygamy the right to vote and to hold office because, as the Court construed the statute, it "simply excludes from the privilege of voting, or of holding any office of honor, trust or profit, those who have been convicted of certain offences, and those who advocate a practical resistance to the laws of the Territory and justify and approve the commission of crimes forbidden by it." *Id.,* at 347. To the extent *Davis* held that persons advocating a certain practice may be denied the right to vote, it is no longer good law. *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969) *(per curiam).* To the extent it held that the groups designated in the statute may be deprived of the right to vote because of their status, its ruling could not stand without surviving strict scrutiny, a most doubtful outcome. *Dunn* v. *Blumstein,* 405 U. S. 330, 337 (1972); cf. *United States* v. *Brown,* 381 U. S. 437 (1965); *United States* v. *Robel,* 389 U. S. 258 (1967). To the extent *Davis* held that a convicted felon may be denied the right to vote, its holding is not implicated by our decision and is unexceptionable. See *Richardson* v. *Ramirez,* 418 U. S. 24 (1974).

A second and related point is that laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 534

(1973). Even laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it. We conclude that, in addition to the far-reaching deficiencies of Amendment 2 that we have noted, the principles it offends, in another sense, are conventional and venerable; a law must bear a rational relationship to a legitimate governmental purpose, *Kadrmas* v. *Dickinson Public Schools*, 487 U. S. 450, 462 (1988), and Amendment 2 does not.

The primary rationale the State offers for Amendment 2 is respect for other citizens' freedom of association, and in particular the liberties of landlords or employers who have personal or religious objections to homosexuality. Colorado also cites its interest in conserving resources to fight discrimination against other groups. The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them. We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit. "[C]lass legislation . . . [is] obnoxious to the prohibitions of the Fourteenth Amendment . . . ." *Civil Rights Cases*, 109 U. S., at 24.

We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class of persons a stranger to its laws. Amendment 2 violates the Equal Protection Clause,

and the judgment of the Supreme Court of Colorado is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Court has mistaken a Kulturkampf for a fit of spite. The constitutional amendment before us here is not the manifestation of a " 'bare . . . desire to harm' " homosexuals, *ante*, at 634, but is rather a modest attempt by seemingly tolerant Coloradans to preserve traditional sexual mores against the efforts of a politically powerful minority to revise those mores through use of the laws. That objective, and the means chosen to achieve it, are not only unimpeachable under any constitutional doctrine hitherto pronounced (hence the opinion's heavy reliance upon principles of righteousness rather than judicial holdings); they have been specifically approved by the Congress of the United States and by this Court.

In holding that homosexuality cannot be singled out for disfavorable treatment, the Court contradicts a decision, unchallenged here, pronounced only 10 years ago, see *Bowers* v. *Hardwick*, 478 U. S. 186 (1986), and places the prestige of this institution behind the proposition that opposition to homosexuality is as reprehensible as racial or religious bias. Whether it is or not is *precisely* the cultural debate that gave rise to the Colorado constitutional amendment (and to the preferential laws against which the amendment was directed). Since the Constitution of the United States says nothing about this subject, it is left to be resolved by normal democratic means, including the democratic adoption of provisions in state constitutions. This Court has no business imposing upon all Americans the resolution favored by the elite class from which the Members of this institution are selected, pronouncing that "animosity" toward homosexuality, *ante*, at 634, is evil. I vigorously dissent.

## I

Let me first discuss Part II of the Court's opinion, its longest section, which is devoted to rejecting the State's arguments that Amendment 2 "puts gays and lesbians in the same position as all other persons," and "does no more than deny homosexuals special rights," *ante*, at 626. The Court concludes that this reading of Amendment 2's language is "implausible" under the "authoritative construction" given Amendment 2 by the Supreme Court of Colorado. *Ibid.*

In reaching this conclusion, the Court considers it unnecessary to decide the validity of the State's argument that Amendment 2 does not deprive homosexuals of the "protection [afforded by] general laws and policies that prohibit arbitrary discrimination in governmental and private settings." *Ante*, at 630. I agree that we need not resolve that dispute, because the Supreme Court of Colorado has resolved it for us. In the case below, 882 P. 2d 1335 (1994), the Colorado court stated:

> "[I]t is significant to note that Colorado law currently proscribes discrimination against persons who are not suspect classes, including discrimination based on age, § 24–34–402(1)(a), 10A C. R. S. (1994 Supp.); marital or family status, § 24–34–502(1)(a), 10A C. R. S. (1994 Supp.); veterans' status, § 28–3–506, 11B C. R. S. (1989); and for any legal, off-duty conduct such as smoking tobacco, § 24–34–402.5, 10A C. R. S. (1994 Supp.). *Of course Amendment 2 is not intended to have any effect on this legislation, but seeks only to prevent the adoption of anti-discrimination laws intended to protect gays, lesbians, and bisexuals.*" *Id.*, at 1346, n. 9 (emphasis added).

The Court utterly fails to distinguish this portion of the Colorado court's opinion. Colorado Rev. Stat. § 24–34–402.5 (Supp. 1995), which this passage authoritatively declares *not* to be affected by Amendment 2, was respondents' primary

example of a generally applicable law whose protections would be unavailable to homosexuals under Amendment 2. See Brief for Respondents Evans et al. 11–12. The clear import of the Colorado court's conclusion that it is not affected is that "general laws and policies that prohibit arbitrary discrimination" would continue to prohibit discrimination on the basis of homosexual conduct as well. This analysis, which is fully in accord with (indeed, follows inescapably from) the text of the constitutional provision, lays to rest such horribles, raised in the course of oral argument, as the prospect that assaults upon homosexuals could not be prosecuted. The amendment prohibits *special treatment* of homosexuals, and nothing more. It would not affect, for example, a requirement of state law that pensions be paid to all retiring state employees with a certain length of service; homosexual employees, as well as others, would be entitled to that benefit. But it would prevent the State or any municipality from making death-benefit payments to the "life partner" of a homosexual when it does not make such payments to the long-time roommate of a nonhomosexual employee. Or again, it does not affect the requirement of the State's general insurance laws that customers be afforded coverage without discrimination unrelated to anticipated risk. Thus, homosexuals could not be denied coverage, or charged a greater premium, with respect to auto collision insurance; but neither the State nor any municipality could require that distinctive health insurance risks associated with homosexuality (if there are any) be ignored.

Despite all of its hand wringing about the potential effect of Amendment 2 on general antidiscrimination laws, the Court's opinion ultimately does not dispute all this, but assumes it to be true. See *ante*, at 630. The only denial of equal treatment it contends homosexuals have suffered is this: They may not obtain *preferential* treatment without amending the State Constitution. That is to say, the principle underlying the Court's opinion is that one who is ac-

corded equal treatment under the laws, but cannot as readily as others obtain *preferential* treatment under the laws, has been denied equal protection of the laws. If merely stating this alleged "equal protection" violation does not suffice to refute it, our constitutional jurisprudence has achieved terminal silliness.

The central thesis of the Court's reasoning is that any group is denied equal protection when, to obtain advantage (or, presumably, to avoid disadvantage), it must have recourse to a more general and hence more difficult level of political decisionmaking than others. The world has never heard of such a principle, which is why the Court's opinion is so long on emotive utterance and so short on relevant legal citation. And it seems to me most unlikely that any multi-level democracy can function under such a principle. For *whenever* a disadvantage is imposed, or conferral of a benefit is prohibited, at one of the higher levels of democratic decisionmaking (*i. e.*, by the state legislature rather than local government, or by the people at large in the state constitution rather than the legislature), the affected group has (under this theory) been denied equal protection. To take the simplest of examples, consider a state law prohibiting the award of municipal contracts to relatives of mayors or city councilmen. Once such a law is passed, the group composed of such relatives must, in order to get the benefit of city contracts, persuade the state legislature—unlike all other citizens, who need only persuade the municipality. It is ridiculous to consider this a denial of equal protection, which is why the Court's theory is unheard of.

The Court might reply that the example I have given is *not* a denial of equal protection only because the same "rational basis" (avoidance of corruption) which renders constitutional the *substantive discrimination* against relatives (*i. e.*, the fact that they alone cannot obtain city contracts) also automatically suffices to sustain what might be called the *electoral-procedural discrimination* against them (*i. e.*,

the fact that they must go to the state level to get this changed). This is of course a perfectly reasonable response, and would explain why "electoral-procedural discrimination" has not hitherto been heard of: A law that is valid in its substance is automatically valid in its level of enactment. But the Court cannot afford to make this argument, for as I shall discuss next, there is no doubt of a rational basis for the substance of the prohibition at issue here. The Court's entire novel theory rests upon the proposition that there is something *special*—something that cannot be justified by normal "rational basis" analysis—in making a disadvantaged group (or a nonpreferred group) resort to a higher decision-making level. That proposition finds no support in law or logic.

## II

I turn next to whether there was a legitimate rational basis for the substance of the constitutional amendment—for the prohibition of special protection for homosexuals.[1] It is unsurprising that the Court avoids discussion of this question, since the answer is so obviously yes. The case most relevant to the issue before us today is not even mentioned in the Court's opinion: In *Bowers* v. *Hardwick*, 478 U. S. 186 (1986), we held that the Constitution does not prohibit what virtually all States had done from the founding of the Republic until very recent years—making homosexual conduct a crime. That holding is unassailable, except by those who

---

[1] The Court evidently agrees that "rational basis"—the normal test for compliance with the Equal Protection Clause—is the governing standard. The trial court rejected respondents' argument that homosexuals constitute a "suspect" or "quasi-suspect" class, and respondents elected not to appeal that ruling to the Supreme Court of Colorado. See 882 P. 2d 1335, 1341, n. 3 (1994). And the Court implicitly rejects the Supreme Court of Colorado's holding, *Evans* v. *Romer*, 854 P. 2d 1270, 1282 (1993), that Amendment 2 infringes upon a "fundamental right" of "independently identifiable class[es]" to "participate equally in the political process." See *ante*, at 625.

think that the Constitution changes to suit current fashions. But in any event it is a given in the present case: Respondents' briefs did not urge overruling *Bowers,* and at oral argument respondents' counsel expressly disavowed any intent to seek such overruling, Tr. of Oral Arg. 53. If it is constitutionally permissible for a State to make homosexual conduct criminal, surely it is constitutionally permissible for a State to enact other laws merely *disfavoring* homosexual conduct. (As the Court of Appeals for the District of Columbia Circuit has aptly put it: "If the Court [in *Bowers*] was unwilling to object to state laws that criminalize the behavior that defines the class, it is hardly open . . . to conclude that state sponsored discrimination against the class is invidious. After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Padula* v. *Webster,* 822 F. 2d 97, 103 (1987).) And *a fortiori* it is constitutionally permissible for a State to adopt a provision *not even* disfavoring homosexual conduct, but merely prohibiting all levels of state government from bestowing *special protections* upon homosexual conduct. Respondents (who, unlike the Court, cannot afford the luxury of ignoring inconvenient precedent) counter *Bowers* with the argument that a greater-includes-the-lesser rationale cannot justify Amendment 2's application to individuals who do not engage in homosexual acts, but are merely of homosexual "orientation." Some Courts of Appeals have concluded that, with respect to laws of this sort at least, that is a distinction without a difference. See *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati,* 54 F. 3d 261, 267 (CA6 1995) ("[F]or purposes of these proceedings, it is virtually impossible to distinguish or separate individuals of a particular *orientation* which predisposes them toward a particular sexual conduct from those who actually *engage* in that particular type of sexual conduct"); *Steffan* v. *Perry,* 41 F. 3d 677, 689–690 (CADC 1994). The Supreme Court of Colorado itself appears to be of this view. See 882 P. 2d, at

1349–1350 ("Amendment 2 targets this class of persons based on four characteristics: sexual orientation; conduct; practices, and relationships. Each characteristic provides a potentially different way of identifying that class of persons who are gay, lesbian, or bisexual. These four characteristics are not truly severable from one another because each provides nothing more than a different way of identifying *the same class of persons*") (emphasis added).

But assuming that, in Amendment 2, a person of homosexual "orientation" is someone who does not engage in homosexual conduct but merely has a tendency or desire to do so, *Bowers* still suffices to establish a rational basis for the provision. If it is rational to criminalize the conduct, surely it is rational to deny special favor and protection to those with a self-avowed tendency or desire to engage in the conduct. Indeed, where criminal sanctions are not involved, homosexual "orientation" is an acceptable stand-in for homosexual conduct. A State "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect," *Dandridge* v. *Williams*, 397 U. S. 471, 485 (1970). Just as a policy barring the hiring of methadone users as transit employees does not violate equal protection simply because *some* methadone users pose no threat to passenger safety, see *New York City Transit Authority* v. *Beazer*, 440 U. S. 568 (1979), and just as a mandatory retirement age of 50 for police officers does not violate equal protection even though it prematurely ends the careers of many policemen over 50 who still have the capacity to do the job, see *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307 (1976) *(per curiam)*, Amendment 2 is not constitutionally invalid simply because it could have been drawn more precisely so as to withdraw special antidiscrimination protections only from those of homosexual "orientation" who actually engage in homosexual conduct. As JUSTICE KENNEDY wrote, when he was on the Court of Appeals, in a case involving discharge of homosexuals from the Navy: "Nearly any

statute which classifies people may be irrational as applied in particular cases. Discharge of the particular plaintiffs before us would be rational, under minimal scrutiny, not because their particular cases present the dangers which justify Navy policy, but instead because the general policy of discharging all homosexuals is rational." *Beller* v. *Middendorf,* 632 F. 2d 788, 808–809, n. 20 (CA9 1980) (citation omitted). See also *Ben-Shalom* v. *Marsh,* 881 F. 2d 454, 464 (CA7 1989), cert. denied, 494 U. S. 1004 (1990).

Moreover, even if the provision regarding homosexual "orientation" *were* invalid, respondents' challenge to Amendment 2—which is a facial challenge—must fail. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno,* 481 U. S. 739, 745 (1987). It would not be enough for respondents to establish (if they could) that Amendment 2 is unconstitutional as applied to those of homosexual "orientation"; since, under *Bowers,* Amendment 2 is unquestionably constitutional as applied to those who engage in homosexual conduct, the facial challenge cannot succeed. Some individuals of homosexual "orientation" who do not engage in homosexual acts might successfully bring an as-applied challenge to Amendment 2, but so far as the record indicates, none of the respondents is such a person. See App. 4–5 (complaint describing each of the individual respondents as either "a gay man" or "a lesbian").[2]

---

[2] The Supreme Court of Colorado stated: "We hold that the portions of Amendment 2 that would remain if only the provision concerning sexual orientation were stricken are not autonomous and thus, not severable," 882 P. 2d, at 1349. That statement was premised, however, on the proposition that "[the] four characteristics [described in the Amendment—sexual orientation, conduct, practices, and relationships] are not truly severable from one another because each provides nothing more than a different way of identifying *the same class of persons.*" *Id.,* at 1349–1350 (emphasis added). As I have discussed above, if that premise is true—if the

## III

The foregoing suffices to establish what the Court's failure to cite any case remotely in point would lead one to suspect: No principle set forth in the Constitution, nor even any imagined by this Court in the past 200 years, prohibits what Colorado has done here. But the case for Colorado is much stronger than that. What it has done is not only unprohibited, but eminently reasonable, with close, congressionally approved precedent in earlier constitutional practice.

First, as to its eminent reasonableness. The Court's opinion contains grim, disapproving hints that Coloradans have been guilty of "animus" or "animosity" toward homosexuality, as though that has been established as un-American. Of course it is our moral heritage that one should not hate any human being or class of human beings. But I had thought that one could consider certain conduct reprehensible—murder, for example, or polygamy, or cruelty to animals—and could exhibit even "animus" toward such conduct. Surely that is the only sort of "animus" at issue here: moral disapproval of homosexual conduct, the same sort of moral disapproval that produced the centuries-old criminal laws that we held constitutional in *Bowers*. The Colorado amendment does not, to speak entirely precisely, prohibit giving favored status to people who are *homosexuals;* they can be favored for many reasons—for example, because they are senior citizens or members of racial minorities. But it prohibits giving them favored status *because of their homosexual conduct*—that is, it prohibits favored status *for homosexuality.*

But though Coloradans are, as I say, *entitled* to be hostile toward homosexual conduct, the fact is that the degree of hostility reflected by Amendment 2 is the smallest conceiv-

---

entire class affected by the Amendment takes part in homosexual conduct, practices, and relationships—*Bowers* alone suffices to answer all constitutional objections. Separate consideration of persons of homosexual "orientation" is necessary only if one believes (as the Supreme Court of Colorado did not) that that is a distinct class.

able. The Court's portrayal of Coloradans as a society fallen victim to pointless, hate-filled "gay-bashing" is so false as to be comical. Colorado not only is one of the 25 States that have repealed their antisodomy laws, but was among the first to do so. See 1971 Colo. Sess. Laws, ch. 121, § 1. But the society that eliminates criminal punishment for homosexual acts does not necessarily abandon the view that homosexuality is morally wrong and socially harmful; often, abolition simply reflects the view that enforcement of such criminal laws involves unseemly intrusion into the intimate lives of citizens. Cf. Brief for Lambda Legal Defense and Education Fund, Inc., et al. as *Amici Curiae* in *Bowers* v. *Hardwick*, O. T. 1985, No. 85–140, p. 25, n. 21 (antisodomy statutes are "unenforceable by any but the most offensive snooping and wasteful allocation of law enforcement resources"); Kadish, The Crisis of Overcriminalization, 374 The Annals of the American Academy of Political and Social Science 157, 161 (1967) ("To obtain evidence [in sodomy cases], police are obliged to resort to behavior which tends to degrade and demean both themselves personally and law enforcement as an institution").

There is a problem, however, which arises when criminal sanction of homosexuality is eliminated but moral and social disapprobation of homosexuality is meant to be retained. The Court cannot be unaware of that problem; it is evident in many cities of the country, and occasionally bubbles to the surface of the news, in heated political disputes over such matters as the introduction into local schools of books teaching that homosexuality is an optional and fully acceptable "alternative life style." The problem (a problem, that is, for those who wish to retain social disapprobation of homosexuality) is that, because those who engage in homosexual conduct tend to reside in disproportionate numbers in certain communities, see Record, Exh. MMM, have high disposable income, see *ibid.;* App. 254 (affidavit of Prof. James Hunter), and, of course, care about homosexual-rights issues much

more ardently than the public at large, they possess political power much greater than their numbers, both locally and statewide. Quite understandably, they devote this political power to achieving not merely a grudging social toleration, but full social acceptance, of homosexuality. See, *e. g.*, Jacobs, The Rhetorical Construction of Rights: The Case of the Gay Rights Movement, 1969–1991, 72 Neb. L. Rev. 723, 724 (1993) ("[T]he task of gay rights proponents is to move the center of public discourse along a continuum from the rhetoric of disapprobation, to rhetoric of tolerance, and finally to affirmation").

By the time Coloradans were asked to vote on Amendment 2, their exposure to homosexuals' quest for social endorsement was not limited to newspaper accounts of happenings in places such as New York, Los Angeles, San Francisco, and Key West. Three Colorado cities—Aspen, Boulder, and Denver—had enacted ordinances that listed "sexual orientation" as an impermissible ground for discrimination, equating the moral disapproval of homosexual conduct with racial and religious bigotry. See Aspen Municipal Code § 13–98 (1977); Boulder Rev. Municipal Code §§ 12–1–1 to 12–1–11 (1987); Denver Rev. Municipal Code, Art. IV, §§ 28–91 to 28–116 (1991). The phenomenon had even appeared statewide:. The Governor of Colorado had signed an executive order pronouncing that "in the State of Colorado we recognize the diversity in our pluralistic society and strive to bring an end to discrimination in any form," and directing state agency-heads to "ensure non-discrimination" in hiring and promotion based on, among other things, "sexual orientation." Executive Order No. D0035 (Dec. 10, 1990). I do not mean to be critical of these legislative successes; homosexuals are as entitled to use the legal system for reinforcement of their moral sentiments as is the rest of society. But they are subject to being countered by lawful, democratic countermeasures as well.

That is where Amendment 2 came in. It sought to counter both the geographic concentration and the disproportionate political power of homosexuals by (1) resolving the controversy at the statewide level, and (2) making the election a single-issue contest for both sides. It put directly, to all the citizens of the State, the question: Should homosexuality be given special protection? They answered no. The Court today asserts that this most democratic of procedures is unconstitutional. Lacking any cases to establish that facially absurd proposition, it simply asserts that it *must* be unconstitutional, because it has never happened before.

> "[Amendment 2] identifies persons by a single trait and then denies them protection across the board. The resulting disqualification of a class of persons from the right to seek specific protection from the law is unprecedented in our jurisprudence. The absence of precedent for Amendment 2 is itself instructive . . . .
>
> "It is not within our constitutional tradition to enact laws of this sort. Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." *Ante,* at 633.

As I have noted above, this is proved false every time a state law prohibiting or disfavoring certain conduct is passed, because such a law prevents the adversely affected group— whether drug addicts, or smokers, or gun owners, or motorcyclists—from changing the policy thus established in "each of [the] parts" of the State. What the Court says is even demonstrably false at the constitutional level. The Eighteenth Amendment to the Federal Constitution, for example, deprived those who drank alcohol not only of the power to alter the policy of prohibition *locally* or through *state legislation,* but even of the power to alter it through *state constitutional amendment* or *federal legislation.* The

648

Establishment Clause of the First Amendment prevents theocrats from having their way by converting their fellow citizens at the local, state, or federal statutory level; as does the Republican Form of Government Clause prevent monarchists.

But there is a much closer analogy, one that involves precisely the effort by the majority of citizens to preserve its view of sexual morality statewide, against the efforts of a geographically concentrated and politically powerful minority to undermine it. The Constitutions of the States of Arizona, Idaho, New Mexico, Oklahoma, and Utah *to this day contain provisions stating that polygamy is "forever prohibited."* See Ariz. Const., Art. XX, par. 2; Idaho Const., Art. I, § 4; N. M. Const., Art. XXI, § 1; Okla. Const., Art. I, § 2; Utah Const., Art. III, § 1. Polygamists, and those who have a polygamous "orientation," have been "singled out" by these provisions for much more severe treatment than merely denial of favored status; and that treatment can only be changed by achieving amendment of the state constitutions. The Court's disposition today suggests that these provisions are unconstitutional, and that polygamy must be permitted in these States on a state-legislated, or perhaps even local-option, basis—unless, of course, polygamists for some reason have fewer constitutional rights than homosexuals.

The United States Congress, by the way, *required* the inclusion of these antipolygamy provisions in the Constitutions of Arizona, New Mexico, Oklahoma, and Utah, as a condition of their admission to statehood. See Arizona Enabling Act, 36 Stat. 569; New Mexico Enabling Act, 36 Stat. 558; Oklahoma Enabling Act, 34 Stat. 269; Utah Enabling Act, 28 Stat. 108. (For Arizona, New Mexico, and Utah, moreover, the Enabling Acts required that the antipolygamy provisions be "irrevocable without the consent of the United States and the people of said State"—so that not only were "each of [the] parts" of these States not "open on impartial terms" to polygamists, but even the States as a whole were not;

polygamists would have to persuade the whole country to their way of thinking.)  Idaho adopted the constitutional provision on its own, but the 51st Congress, which admitted Idaho into the Union, found its Constitution to be "republican in form *and . . . in conformity with the Constitution of the United States."*   Act of Admission of Idaho, 26 Stat. 215 (emphasis added).   Thus, this "singling out" of the sexual practices of a single group for statewide, democratic vote—so utterly alien to our constitutional system, the Court would have us believe—has not only happened, but has received the explicit approval of the United States Congress.

I cannot say that this Court has explicitly approved any of these state constitutional provisions; but it has approved a territorial statutory provision that went even further, depriving polygamists of the ability even to achieve a constitutional amendment, by depriving them of the power to vote. In *Davis* v. *Beason,* 133 U. S. 333 (1890), Justice Field wrote for a unanimous Court:

> "In our judgment, § 501 of the Revised Statutes of Idaho Territory, which provides that 'no person . . . who is a bigamist or polygamist or who teaches, advises, counsels, or encourages any person or persons to become bigamists or polygamists, or to commit any other crime defined by law, or to enter into what is known as plural or celestial marriage, or who is a member of any order, organization or association which teaches, advises, counsels, or encourages its members or devotees or any other persons to commit the crime of bigamy or polygamy, or any other crime defined by law . . . is permitted to vote at any election, or to hold any position or office of honor, trust, or profit within this Territory,' *is not open to any constitutional or legal objection."*   *Id.,* at 346–347 (emphasis added).

To the extent, if any, that this opinion permits the imposition of adverse consequences upon mere abstract advocacy of po-

lygamy, it has, of course, been overruled by later cases. See *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969) *(per curiam).* But the proposition that polygamy can be criminalized, and those engaging in that crime deprived of the vote, remains good law. See *Richardson* v. *Ramirez,* 418 U. S. 24, 53 (1974). *Beason* rejected the argument that "such discrimination is a denial of the equal protection of the laws." Brief for Appellant in *Davis* v. *Beason,* O. T. 1889, No. 1261, p. 41. Among the Justices joining in that rejection were the two whose views in other cases the Court today treats as equal protection lodestars—Justice Harlan, who was to proclaim in *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (dissenting opinion), that the Constitution "neither knows nor tolerates classes among citizens," quoted *ante,* at 623, and Justice Bradley, who had earlier declared that "class legislation . . . [is] obnoxious to the prohibitions of the Fourteenth Amendment," *Civil Rights Cases,* 109 U. S. 3, 24 (1883), quoted *ante,* at 635.[3]

---

[3] The Court labors mightily to get around *Beason,* see *ante,* at 634, but cannot escape the central fact that this Court found the statute at issue— which went much further than Amendment 2, denying polygamists not merely special treatment but the right *to vote*—"not open to any constitutional or legal objection," rejecting the appellant's argument (much like the argument of respondents today) that the statute impermissibly "single[d] him out," Brief for Appellant in *Davis* v. *Beason,* O. T. 1889, No. 1261, p. 41. The Court adopts my conclusions that (a) insofar as *Beason* permits the imposition of adverse consequences based upon mere advocacy, it has been overruled by subsequent cases, and (b) insofar as *Beason* holds that convicted felons may be denied the right to vote, it remains good law. To these conclusions, it adds something new: the claim that "[t]o the extent *[Beason]* held that the groups designated in the statute may be deprived of the right to vote because of their status, its ruling could not stand without surviving strict scrutiny, a most doubtful outcome." *Ante,* at 634. But if that is so, it is only because we have declared the right *to vote* to be a "fundamental political right," see, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972), deprivation of which triggers strict scrutiny. Amendment 2, of course, does not deny the fundamental right to vote, and the Court rejects the Colorado court's view that there exists a fundamental right to participate in the political process. Strict scrutiny is thus not in play here. See *ante,* at 631. Finally, the Court's

This Court cited *Beason* with approval as recently as 1993, in an opinion authored by the same Justice who writes for the Court today. That opinion said: "[A]dverse impact will not always lead to a finding of impermissible targeting. For example, a social harm may have been a legitimate concern of government for reasons quite apart from discrimination. . . . See, *e. g.*, . . . *Davis* v. *Beason*, 133 U. S. 333 (1890)." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 535 (1993). It remains to be explained how § 501 of the Idaho Revised Statutes was not an "impermissible targeting" of polygamists, but (the much more mild) Amendment 2 is an "impermissible targeting" of homosexuals. Has the Court concluded that the perceived social harm of polygamy is a "legitimate concern of government," and the perceived social harm of homosexuality is not?

## IV

I strongly suspect that the answer to the last question is yes, which leads me to the last point I wish to make: The Court today, announcing that Amendment 2 "defies . . . conventional [constitutional] inquiry," *ante*, at 632, and "confounds [the] normal process of judicial review," *ante*, at 633, employs a constitutional theory heretofore unknown to frustrate Colorado's reasonable effort to preserve traditional American moral values. The Court's stern disapproval of "animosity" towards homosexuality might be compared with what an earlier Court (including the revered Justices Harlan and Bradley) said in *Murphy* v. *Ramsey*, 114 U. S. 15 (1885), rejecting a constitutional challenge to a United States statute that denied the franchise in federal territories to those who engaged in polygamous cohabitation:

> "[C]ertainly no legislation can be supposed more wholesome and necessary in the founding of a free, self-

suggestion that § 501 of the Revised Statutes of Idaho, and Amendment 2, deny rights on account of "status" (rather than conduct) opens up a broader debate involving the significance of *Bowers* to this case, a debate which the Court is otherwise unwilling to join, see *supra*, at 640–643.

governing commonwealth, fit to take rank as one of the co-ordinate States of the Union, than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement." *Id.*, at 45.

I would not myself indulge in such official praise for heterosexual monogamy, because I think it no business of the courts (as opposed to the political branches) to take sides in this culture war.

But the Court today has done so, not only by inventing a novel and extravagant constitutional doctrine to take the victory away from traditional forces, but even by verbally disparaging as bigotry adherence to traditional attitudes. To suggest, for example, that this constitutional amendment springs from nothing more than "'a bare . . . desire to harm a politically unpopular group,'" *ante,* at 634, quoting *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 534 (1973), is nothing short of insulting. (It is also nothing short of preposterous to call "politically unpopular" a group which enjoys enormous influence in American media and politics, and which, as the trial court here noted, though composing no more than 4% of the population had the support of 46% of the voters on Amendment 2, see App. to Pet. for Cert. C–18.)

When the Court takes sides in the culture wars, it tends to be with the knights rather than the villeins—and more specifically with the Templars, reflecting the views and values of the lawyer class from which the Court's Members are drawn. How that class feels about homosexuality will be evident to anyone who wishes to interview job applicants at virtually any of the Nation's law schools. The interviewer may refuse to offer a job because the applicant is a Republican; because he is an adulterer; because he went to the wrong

prep school or belongs to the wrong country club; because he eats snails; because he is a womanizer; because she wears real-animal fur; or even because he hates the Chicago Cubs. But if the interviewer should wish not to be an associate or partner of an applicant because he disapproves of the applicant's homosexuality, *then* he will have violated the pledge which the Association of American Law Schools requires all its member schools to exact from job interviewers: "assurance of the employer's willingness" to hire homosexuals. Bylaws of the Association of American Law Schools, Inc. § 6–4(b); Executive Committee Regulations of the Association of American Law Schools § 6.19, in 1995 Handbook, Association of American Law Schools. This law-school view of what "prejudices" must be stamped out may be contrasted with the more plebeian attitudes that apparently still prevail in the United States Congress, which has been unresponsive to repeated attempts to extend to homosexuals the protections of federal civil rights laws, see, *e. g.*, Employment Non-Discrimination Act of 1994, S. 2238, 103d Cong., 2d Sess. (1994); Civil Rights Amendments of 1975, H. R. 5452, 94th Cong., 1st Sess. (1975), and which took the pains to exclude them specifically from the Americans with Disabilities Act of 1990, see 42 U. S. C. § 12211(a) (1988 ed., Supp. V).

\*     \*     \*

Today's opinion has no foundation in American constitutional law, and barely pretends to. The people of Colorado have adopted an entirely reasonable provision which does not even disfavor homosexuals in any substantive sense, but merely denies them preferential treatment. Amendment 2 is designed to prevent piecemeal deterioration of the sexual morality favored by a majority of Coloradans, and is not only an appropriate means to that legitimate end, but a means that Americans have employed before. Striking it down is an act, not of judicial judgment, but of political will. I dissent.