OPINION OF THE COURT
SPISAK, Judge:
Charged with rape, housebreaking, and two specifications of indecent assault, the appellant pled guilty to one specification of indecent assault and to unlawful entry as opposed to housebreaking. He pled not guilty to rape and the remaining specification of indecent assault. The military judge found the appellant guilty of the indecent assault, but withheld findings on the unlawful entry -plea in order to allow the government to prove the charged offense of housebreaking. The appellant’s defense counsel, in response to questions from the military judge, asked that the members be advised of the finding of guilty to the one specification of indecent assault and of his plea of guilty to unlawful entry. Officer members found the appellant not guilty of rape but guilty of the lesser included offense of indecent assault; not guilty of the remaining specification of indecent assault but guilty of assault consummated by a battery; and, contrary to his *898 guilty plea to the lesser included offense of unlawful entry, guilty of housebreaking.
The members sentenced the appellant to receive a bad-conduct discharge, be confined for 6 months, serve three months at hard labor without confinement, and be reduced to the grade of E-3, Airman First Class. The convening authority reduced the hard labor without confinement to one month but otherwise approved the sentence. The appellant now raises four assignments of error: (1) legal and factual sufficiency of the evidence of indecent assault in Charge I which had been charged as rape; (2) testimony from a psychologist improperly bolstered the credibility of a key government witness; (3) Military Rule of Evidence (Mil.R.Evid.) 413 violates the Due Process and Equal Protection Clauses of the United States Constitution; and (4) the military judge erred by not going through a United States v. Bertelson-type inquiry when the appellant admitted facts establishing a prima facie case of housebreaking during his guilty plea inquiry. Finding no error, we affirm.
FACTS
When the appellant’s co-worker, Airman First Class (A1C) JD, and her husband separated, the appellant offered to help her move. At about 2 A.M. the morning of the planned move, the appellant called to ask if he could come over early rather than wait until the planned moving time. A1C JD had a girlfriend, Airman (Amn) C, at the apartment helping her move small things, so she agreed. The two women met the appellant in a nearby parking lot and he followed them to the new apartment where they unloaded A1C JD’s car. They then returned to the old apartment and chatted until the two women fell asleep. A1C JD curled up on one end of the couch with the appellant sitting on the other end. Amn C was asleep on a love seat a few feet away.
A1C JD awoke about 3 A.M. with the appellant “kind of on top of’ her. She told several versions of the story to various people. To one friend she said she awoke to find the appellant kissing her and with his hands on her body. To another friend she said that he had his finger in her vagina when she awoke. To the OSI she first said the appellant had his finger in her vagina, but latter asserted that it was his penis.
A1C JD testified that, when she awoke, her shorts were unbuttoned, unzipped, and pulled down to the middle of her thighs and her panties were pulled aside. She first testified that the appellant was “trying to put his penis inside [her] vagina,” then, in response to the question, “How far did he get?”, A1C JD answered, “I’m not for sure, but I would think maybe one fourth of his penis.” A1C JD testified that when she yelled at him the appellant asked if she wanted him to leave. She said, “I don’t give a f— what you do, just don’t touch me.” The appellant left and JD went back to sleep without locking the door.
When she awoke around 9 A.M., A1C JD told Amn C what had happened, including that the appellant had tried to insert his penis into her vagina. The appellant returned to help with the remainder of the move and A1C JD allowed him to help because, she said, not many other friends had come to her assistance. At an office staff meeting the next week, A1C JD thanked the appellant for his help. A number of witnesses testified that they noticed no difference in A1C JD’s attitude toward the appellant after her move.
A few weeks later, while at work, A1C JD was in a storage room getting something when the appellant came up behind her and placed his hand between her legs and against her vagina. She yelled at him and he left. Amn C and another airman were standing in the hallway just outside the storeroom and heard A1C JD and the appellant talking. After the appellant left, A1C JD came out of the storeroom and told Amn C that the appellant had grabbed her between the legs. A1C JD never reported either incident to anyone in authority.
Several months later, A1C SP, saw the appellant talking to a friend of hers in the lobby of the Enlisted Club. A1C SP rejoined her other friends in the Club bar for a short time then walked back to her dormitory. She passed the appellant in the dormitory hallway. Shortly after she returned to her *899 room, A1C SP heard a knock on her neighbor’s door, then on her own. When she opened the door A1C SP saw the appellant, who asked if she knew where her neighbor had gone. A1C SP said she didn’t know and tried to close the door, but the appellant held the door and asked why a pretty thing like her had come home alone. She replied, “None of your business,” and closed the door. At about 5 A.M. the next morning, A1C SP awoke with someone putting his finger in her vagina under her panties. She yelled and asked, “What are you doing?” and her assailant said, “I thought you invited me to come back.” As he left, she saw the appellant’s face clearly. She reported the incident to the security police a few days later after she asked her friend for the name of the man with whom she had been speaking at the Club.
After AJC SP reported that she had been assaulted and the Air Force Office of Special Investigations (OSI) began an investigation, someone told the OSI they should talk with A1C JD. Only when she was questioned by the OSI did A1C JD report the two incidents which had occurred several months earlier and which form the bases of Charge I and Charge III, Specification 1.
PROPENSITY EVIDENCE UNDER Mil.R.Evid. 413
In cases involving sexual assault, Mil. R.Evid. 413 authorizes admission of evidence that the accused has committed one or more other sexual assault offenses and permits the finder of fact to consider this other misconduct “for its bearing on any matter to which it is relevant.” However, the rule was not used in the case at hand to determine whether or not evidence that the appellant sexually assaulted A1C SP was admissible. Despite his plea of guilty to indecently assaulting A1C SP, the government presented evidence of this assault during their case in chief in an effort to prove the intent element of the housebreaking offense. The appellant’s defense counsel admitted that the government had to present evidence of the assault in order to perfect its case on housebreaking, but asked, by way of a motion in limine, that the military judge prevent the trial counsel from arguing that this assault showed a propensity to commit such assaults. The military judge denied the motion and both permitted the trial counsel to make the propensity argument and later instructed the jury concerning the use of such evidence to show propensity.
The appellant does not argue that this use of Mil.R.Evid. 413 was erroneous.[1] Rather, he contends that, because this new rule permits court members to consider other sexual assaults as propensity evidence, it denies him a fair trial in violation of his constitutional rights to due process and equal protection. We begin our consideration of these challenges with his claim of violations of the Due Process Clause.
A. Due Process — Facial Challenge
The Due Process Clause of the Fifth Amendment, United States Constitution, provides two important protections from government action. First, “‘substantive due process’ prevents government from engaging in conduct that ‘shocks the conscience,’ or interferes with rights ‘implicit in the concept of ordered liberty,’ [Second,] [w]hen government action ... survives ‘substantive due process scrutiny, it must still be implemented in a fair manner.’ ” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)(internal citations omitted).
The appellant’s argument does not appear to limit his claim to the manner in which Mil.R.Evid. 413 was applied to his case, but rather attacks the rule itself as unconstitutional. We are, therefore, faced with a facial challenge rather than an as-applied challenge. A facial challenge equates to a “request that the court go beyond the facts before it” to consider whether the law is unconstitutional. Sanjour v. E.P.A., 56 F.3d 85, 92 n. 10 (D.C.Cir.1995) (en banc). In other words, we are faced with a purely substantive due process challenge.
*900 The Supreme Court has noted that a facial challenge is the most difficult challenge on which to succeed, because “the challenger must establish that no set of circumstances exists under which the Act would be valid.” United States v. Salerno, 481 U.S. at 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, in order to succeed, the appellant must demonstrate that no possible application of Mil. R.Evid. 413 would survive constitutional scrutiny.
The Due Process Clause has limited operation beyond the specific guarantees set forth in the Bill of Rights. See Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The Clause does place restrictions on the introduction of evidence, but only where the restriction “offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.” Patterson v. New York, 432 U.S. 197, 201-202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Our first task, therefore, is to determine whether or not admission of uncharged misconduct to demonstrate a propensity to commit criminal acts during the findings portion of a trial violates any of our system’s “fundamental conceptions of justice.” To do so, we must look to historical practice. Montana v. Egelhoff, 518 U.S. 37, 41, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996).
The historical ban on propensity evidence has been discussed in detail by the Tenth Circuit Court of Appeals and in a number of articles and treatises.[2] We will not repeat those discussions here. Rather we note that, over time, the ban on admission of uncharged misconduct has been justified and explained on grounds that such evidence may weigh too much with jurors and over-persuade them of the accused’s guilt. Michelson v. United States, 335 U.S. 469, 475-76, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Despite these fears, a number of exceptions, such as those contained in Mil.R.Evid. 404(b) and its federal equivalent, Fed.R.Evid. 404(b), have developed. These two rules authorize use of uncharged misconduct to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake of fact.
In addition, as the Tenth Circuit Court of Appeals recently pointed out, courts have for many years permitted evidence of other sexual offenses to be admitted during trials on charges of incest. By the early 1920’s, twenty-three states had “lustful disposition,” “sexual proclivity” or “depraved sexual instinct” exceptions for use in cases of statutory rape (unlawful carnal knowledge). Today even more states permit evidence of “lustful dispositions” in cases involving sex offenses against children. See United States v. Castillo, 140 F.3d 874 (10th Cir.1998).
While the fact that several states admit evidence of an accused’s sexual proclivity “is not conclusive in a decision as to whether that practice accords with due process, ... it is plainly worth considering in determining whether the practice ‘offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Leland v. Oregon, 343 U.S. 790, 798, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). The very existence of these exceptions, and those found in Mil.R.Evid. 404(b), favors the government in this argument over whether or not Mil.R.Evid. 413 violates the Due Process Clause. “It is not the [government] which bears the burden of demonstrating that its rule is ‘deeply rooted,’ but rather [the appellant] who must show that the principle of procedure violated by the rule (and allegedly required by due process) is ‘so rooted in the traditions and conscience of our people as to be ranked as fundamental.’” Egelhoff, 518 U.S. 37, 116 S.Ct. at 2019 (quoting Patterson v. New York, 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).
Our study of the history of the ban on admission of uncharged misconduct convinces *901 us that there is no “fundamental conception of justice” which precludes admission of evidence of prior acts of the same type as those of which an accused stands charged. The appellant has failed to show that exclusion of prior acts of misconduct is so fundamental to our system of justice that further exceptions to this exclusion, such as the one created by Mil.R.Evid. 413, cannot be tolerated. Therefore, his challenge must fad on substantive due process grounds.
Having failed to find an overriding fundamental concept of justice which is violated by Mil.R.Evid. 413, we conclude that the Rule is not facially invalid under the Due Process Clause. Therefore, trial counsel may use evidence admitted under Mil.R.Evid. 413 to demonstrate an accused’s propensity to commit the charged sexual assault.
B. Equal Protection
The appellant claims that Mil.R.Evid. 413 violates his right to equal protection because it singles out a group of defendants who have allegedly committed sexual offenses. He argues that, because this group has been subjected to the loss of a fundamental right — a fair trial — the “strict scrutiny test” should be applied to determine whether or not this disparate treatment is constitutionally permissible.
The Fourteenth Amendment to the United States Constitution guarantees that no state may deny its citizens equal protection of the laws. While these exact words are not found elsewhere in the constitution, these protections apply to the Federal Government under the provisions of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). When a law impacts a “suspect class” or burdens a fundamental right, the Supreme Court has applied the “strict scrutiny test” to determine the law’s validity. When no suspect class or fundamental right is involved, however, the Court requires only a demonstration of a rational basis as support for the law. Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).
The appellant has not identified, nor are we aware of any holding by the Supreme Court, or any other court for that matter, which identifies sex offenders as a “suspect class.” Therefore, because we have found that Mil.R.Evid. 413 does not deny such offenders a fair trial or otherwise violate the Due Process Clause, only the rational basis test need be applied. A “strong presumption of validity” attaches to the evidentiary classification made in enacting Rule 413. Cf. Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). This argument was also addressed by the Tenth Circuit in Enjady. We again concur with that court’s finding that the congressional intent to provide a means by which evidence of patterns of abuse and similar crimes could be admitted into evidence provides such a basis. Enjady, 134 F.3d at 1433-34; Kyl, 37 Ariz.L.Rev. at 668. We, therefore, conclude that Mil.R.Evid. 413 does not violate the appellant’s constitutional right to equal protection. The congressional objective of enhancing effective prosecution for sexual assaults[3] is a legitimate interest and the appellant’s equal protection claim is without merit.
TESTIMONY OF PSYCHOLOGIST
The appellant contends that the testimony of Dr. G, a psychologist, was improperly admitted to bolster the credibility of A1C JD, one of the victims and a key government witness. As previously noted, we will not disturb the military judge’s determination on questions of admissibility absent a clear abuse of discretion on his part. U.S. v. Lake, 36 M.J. at 322; United States v. Cuellar, 27 M.J. at 54.
Under Mil.R.Evid. 702, a person with “specialized knowledge” may testify as an expert to aid the factfinder in understanding the evidence. United States v. Suarez, 35 M.J. 374, 376 (C.M.A.1992) (and cases cited therein). Expert testimony may not be used to determine the credibility of the victim nor may an expert offer an opinion as to *902 the guilt or innocence of the accused. United States v. Suarez, 35 M.J. at 376. However, if a proper foundation is laid, an expert may offer syndrome evidence to help the trier of fact determine whether the victim mirrors behaviors found in other victims. See United States v. Palmer, 33 M.J. 7, 12 (C.M.A.1991)(allowing testimony on intrafamily dynamics in incest cases); United States v. Carter, 26 M.J. 428 (C.M.A.1988) (recognizing Rape Trauma Syndrome); United States v. Rivera, 26 M.J. 638, 640-43 (A.C.M.R.1988) (Therapist-Patient Sex Syndrome not admissible but error harmless).
After hearing the proposed testimony of Dr. G during an Article 39(a) session, the military judge denied the defense objection to the court receiving testimony from Dr. G. In arriving at this judgment, the military judge found that:
the witness is qualified to testify as an expert, that his testimony is within the limits of his expertise, and that his opinion is based on sufficient factual basis to make it relevant, and, doing a [Mil.R.Evid.] 403 balancing test, I don’t find that the probative value would be substantially outweighed by the danger of unfair prejudice.
The military judge then instructed the trial counsel “not to get into anything about, ‘Do you believe the witness is telling the truth,’ or, you know, any of that kind of thing.” He added that the witness “may testify about traits elicited by victims of sexual abuse and whether or not the alleged victim’s traits are consistent with that.”
During his lengthy testimony, Dr. G addressed both how victims of prolonged child sexual abuse respond to that abuse and other traumatic circumstances in their lives, and how A1C JD reported to him that she had reacted to her alleged rape by the appellant. He compared these two and concluded that A1C JD’s reactions, though unexpected and “incongruent,” were not unusual for one who had been victimized as a child or by one who had been raped. Defense counsel elicited from the doctor that the information on which he based his testimony came primarily from A1C JD and that nothing in her medical records supported her allegations that she had been abused as a child.
During the doctor’s testimony before the court members, trial counsel attempted to ask whether the doctor had noted any “red flags” indicating that A1C JD was definitely lying to him. Later, one of the court members asked: “Do you believe, after talking to Airman [JD] that she told you the truth?” The military judge properly sustained objections to both questions and explained to the court that “case law is clear that people are not allowed to act as human lie detectors.” The military judge later properly instructed the members on how expert testimony should be received and that only they could determine a witness’ credibility. Thus, the military judge properly controlled the testimony of Dr. G, assuring that it was in accord with the limitations he had established during the earlier Article 39(a) session and that the members knew how to use that evidence.
The military judge did not abuse his discretion by admitting this testimony.
APPLICABILITY OF UNITED STATES V BERTELSON TO APPELLANT’S CASE
The appellant argues that, during his plea of guilty to indecent assault on A1C SP,[4] he admitted facts which established a prima facie case of housebreaking,[5] a charge to which he pled not guilty. In support of this contention he points out that commission of a criminal offense after an unlawful entry creates the inference of an intent to commit that offense at the time of entry. Manual for Courts-Martial, United States (1995) 1Í 56c (2). Therefore, he contends that the military judge should have conducted an inquiry in accordance with the requirements of United States v. Bertelson, 3 M.J. 314 (C.M.A.1977), before accepting his pleas of guilty to Charge II and Charge III, Specification 2. We do not agree.
Bertelson stands for the proposition that, before a military judge admits a confessional stipulation into evidence which *903 admits every element of a charged offense, he must ensure that the accused knowingly, intelligently, and voluntarily consented to its admission. Unfortunately for the appellant, no stipulation of fact was ever offered in his case nor did the military judge instruct the members that they could infer his intent from the fact that he pled guilty to indecent assault after the entry was made. Instead, the accused pled to and admitted all of the elements of housebreaking save one — intent — which was left for the government to prove by other relevant evidence.
Under these facts, we find that a Bertelson inquiry would not have been required even if a stipulation of fact had been offered. As we explained in United States v. Kepple, 27 M.J. 773, 779 (A.F.C.M.R.1988), unless a stipulation admits every element and no further evidence is required from the government for a finding of guilty, the stipulation is not confessional and no Bertelson inquiry is required. When the appellant failed to admit one crucial element he obviated the need for a Bertelson inquiry. United States v. Dixon, 45 M.J. 104 (1996) (stipulation admitting all elements of wrongful appropriation did not require Bertelson inquiry when accused was charged with larceny); Kepple, 27 M.J. 773 (stipulation admitting AWOL did not require Bertelson inquiry on charge of desertion); United States v. Floyd, 31 M.J. 755 (A.C.M.R.1990) (stipulation admitting use of cocaine, but not wrongfulness of the use, did not require Bertelson inquiry).
Following the appellant’s pleas of guilty to indecently assaulting A1C SP and to unlawful entry, the lesser included offense of housebreaking, the military judge conducted a pro-vidency inquiry in accordance with United States v. Care, 40 C.M.R. 247, 1969 WL 6059 (1969). The appellant does not complain about this inquiry and we find neither any error nor any prejudice to the appellant from it. Rather, the appellant asks that we expand the Care inquiry to apply Bertelson even when there is no stipulation of fact. We are satisfied that the requirements set forth in Care adequately protect an accused from improvidently pleading guilty and decline to expand the rule.
FACTUAL AND LEGAL SUFFICIENCY
The appellant also contends that the evidence in support of a finding of guilty to the offense of indecent assault on A1C JD is both legally and factually insufficient. He argues that both the victim and her “story” were incredible. We do not agree.
The test for legal sufficiency is “whether considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all essential elements beyond a reasonable doubt,” and the test for factual sufficiency is “whether, after weighing the evidence in the record and making allowances for not having personally observed the witnesses, [we are] convinced of the accused’s guilt beyond a reasonable doubt.” United States v. Turner, 25 M.J. 324-25 (C.M.A.1987).
The members clearly weighed the evidence, including the prior inconsistent statements of A1C JD, and concluded that the appellant did not commit the most serious offenses with which he was charged. Rather, they found him not guilty of rape, but guilty of the lesser included offense of indecent assault, and not guilty of indecent assault, but guilty of assault consulated by a battery. We are satisfied that the evidence was sufficient to enable a reasonable fact finder to reach these findings. We are also ourselves satisfied beyond a reasonable doubt that the appellant assaulted A1C JD on or about April 26,1996, while she slept, and that he committed a battery on her on or about August 1, 1996, when he approached her from behind in the Dental Clinic and placed his hand between her legs. Both incidents were related to A1C JD’s friend Amn C shortly after they occurred and each was sufficiently like the assault on A1C SP for the members and this court to conclude that the appellant committed them.
CONCLUSION
After examining the record of trial, the assignment of errors, and the government’s reply, we conclude that the findings and sentence are correct in law and fact, the sen- *904 tenee is appropriate, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings of guilty and sentence are
AFFIRMED.
Chief Judge ROTHENBURG and Judge SENANDER concur.

. The military judge here properly conducted a balancing of interests under Mil.R.Evid. 403 before admitting the evidence. During such balancing, judges should recognize that the presumption is in favor of admission. United States v. Sumner, 119 F.3d 658 (8th Cir.1997).

. See United States v. Castillo, 140 F.3d 874 (10th Cir.1998); Anne Elsberry Kyl, The Propriety of Propensity: The Effects and Operation of New Federal Rules of Evidence 413 and 414, 37 Ariz. L.Rev. 659 (1995); David J. Karp, Symposium on the Admission of Prior Offense Evidence in Sexual Assault Cases: Evidence of Propensity and Probability in Sex Offense Cases and Other Cases, 70 Chi.-Kent. L.Rev. 15, 28 (1994) (citing 1 John H. Wigmore, Evidence in Trials at Common Law, 58.2 nn. 1-2 (Tillers rev.1983)); Thomas J. Reed, Trial by Propensity: Admission of Other Criminal Acts Evidenced in Federal Criminal Trials, 50 U. Cin. L.Rev. 713, 717-18 nn. 19-20 (1981).

. Karp, Symposium on the Admission of Prior Offense Evidence in Sexual Assault Cases: Evidence of Propensity and Probability in Sex Offense Cases and other Cases, 70 Chi.-Kent L.Rev. 15, 24-25 (1994).

. Charge III, Specification 2.

. Charge II.