[No. 20699-8-III. Division Three. July 18, 2002.]

NAN MIGUEL, *Plaintiff*, MARY JO DAVIS, *Appellant*, v. CHARLES GUESS, ET AL., *Respondents*.

*Richard D. Reed* and *Judith A. Lonnquist* (of *Law Offices of Judith A. Lonnquist, P.S.*), for appellant.

*James B. King* and *Christopher J. Kerley* (of *Keefe, King & Bowman, P.S.*) and *Michael J. McMahon* and *Susan W. Troppmann* (of *Etter, McMahon, Lamberson & Clary, P.C.*), for respondents.

KURTZ, J.— Mary Jo Davis sued Pullman Hospital District No. 1-A (the Hospital) and Charles Guess, M.D., after she was dismissed from her position in the Hospital's radiology department. Ms. Davis believes that she was fired because she is a lesbian. In her lawsuit, she contended that public employment discrimination based solely on sexual orientation is irrational and actionable under 42 U.S.C. § 1983 as a violation of the Equal Protection Clause of the United States Constitution. Her claims were dismissed on summary judgment. We reverse the dismissal and remand for trial Ms. Davis's § 1983 claims against the Hospital and Dr. Guess. In so doing, we hold that Ms. Davis has raised material issues of fact with respect to whether (1) the Hospital and Dr. Guess are state actors for the purposes of § 1983 and (2) they denied her equal protection under the laws. But, we affirm the dismissal of her claim based upon public policy because her discharge did not violate a clear mandate of Washington public policy.

## FACTS

In July 1993, Mary Jo Davis was hired by Pullman Memorial Hospital to work as a sonographer in its radiology department. The director of that department was Dr. Charles Guess, a radiologist with staff privileges. Ms. Davis's immediate supervisor was Nan Miguel, who managed the radiology department.

Ms. Davis and Dr. Guess did not enjoy a good working relationship. Ms. Davis is a lesbian. Before she was hired, Dr. Guess told Ms. Miguel that the Hospital should not hire Ms. Davis because her homosexuality might cause trouble. On a number of occasions, Dr. Guess referred to Ms. Davis as a fucking faggot, a fucking dyke, and a queer. Dr. Guess was also heard to say: " 'I don't think that fucking faggot should be doing vaginal exams and I'm not working with her.' " Clerk's Papers (CP) at 1367. He reaffirmed this sentiment in a statement to Scott Adams, the Hospital Administrator, overheard by Dr. James Harrington, an

emergency room physician. According to Dr. Harrington, Dr. Guess stated: " 'I don't think a queer should be doing vaginal exams.' " CP at 1367. And Mr. Adams replied with words to the effect of: " 'I hear what you're saying. We need to do something about it and we will.' " CP at 1367.

On one occasion, Dr. Guess treated the department staff to ice cream. He told everyone that they were celebrating because Ms. Davis was not at the hospital that day. He remarked that it was gay pride week, and Ms. Davis must be off marching somewhere. Although Ms. Davis's co-workers laughed in response to Dr. Guess's statement, one observer to this event reported that Dr. Guess was not joking.

Dr. Guess's reservations about Ms. Davis were not limited to her lifestyle. He told other employees that Ms. Davis was not properly trained and lacked the necessary experience to be performing ultrasounds. Specifically, he stated that when Ms. Miguel stopped assisting Ms. Davis with the scans, "she was lost in what she was doing." CP at 145. In his deposition, Dr. Guess identified other physicians who had expressed concerns about Ms. Davis's professional skills. As the director of the radiology department, Dr. Guess was responsible for the overall care patients received in his department.

In early November 1994, Ms. Miguel sent a memorandum to Mr. Adams objecting to Dr. Guess's treatment of Ms. Davis. According to Mr. Adams, Ms. Miguel informed him that Dr. Guess " 'was not cooperating with [Ms. Davis] in her being able to perform her duties as an ultrasonographer. That he was critical of her work, that he was uncooperative in trying to provide her necessary information to perform her duties and that he was critical of her lifestyle.' " CP at 2341. Mr. Adams further stated that other employees of the radiology department confirmed these allegations in a department meeting. Later that month, Ms. Davis sent a letter to Mr. Adams, Ms. Miguel, and the Hospital complaining about the way in which Dr. Guess treated her.

At the end of November 1994, Ms. Miguel was placed on paid administrative leave. Mr. Adams explained in a memorandum to Ms. Miguel that she was being placed on leave while the Hospital determined how to restructure the radiology department to create a cohesive group. She was informed that depending upon what the Hospital decided, she might be asked to return in a staff role, a group leader role, or her position might be terminated. Ultimately, the Hospital eliminated Ms. Miguel's position and she lost her job.

As a result of Ms. Davis's and Ms. Miguel's complaints, Mr. Adams and Dr. Margaret Miller, the Hospital's Chief of Medical Staff, met with Dr. Guess. They informed him that his disparaging comments about Ms. Davis, specifically his references to her lifestyle, would not be tolerated by the Hospital. Mr. Adams advised Dr. Guess that no formal disciplinary action through the established medical staff process would be necessary unless the behavior continued. According to Mr. Adams, Dr. Guess agreed to discontinue the behavior.

After his meeting with Mr. Adams and Dr. Miller, Dr. Guess decided that one way to comply with the Hospital's demand that he change his treatment of Ms. Davis would be to minimize his contact with her. Dr. Guess announced that he would begin to perform his own ultrasounds. The immediate impact of this decision was to reduce the amount of work for the radiology technologists. The Hospital responded by reducing Ms. Davis's hours from full time to three-quarters time.

Ms. Davis then retained counsel to file a grievance regarding her reduction in work hours. In preparing for her grievance hearing, Ms. Davis made a photocopy of documents from two patient files in an attempt to prove that her reduction in work hours was the result of Dr. Guess's animus regarding her sexual orientation.

Mr. Adams informed Ms. Davis that her actions in copying information from patient files were in violation of the Hospital's patient confidentiality policies, and Ms. Davis

was given a three-day suspension. Mr. Adams sent Ms. Davis a second letter, in which he informed her that after further consideration, he decided that her acts constituted serious offenses under the Hospital's policies, and she was terminated.

Ms. Davis appealed to the Board of Commissioners (the Board). The Board found that the termination was justified. The Board commented that Ms. Davis breached the confidentiality of patient files and had become a disruptive employee.

*Procedural History.* Ms. Davis filed a complaint against the Hospital and Dr. Guess in November 1996. In due course, Dr. Guess and the Hospital each moved for summary judgment. The court ultimately dismissed all of Ms. Davis's claims against Dr. Guess. The court also dismissed all claims against the Hospital, except for the claims for wrongful discharge in breach of promises made in the employee handbook and violation of due process.

Ms. Davis sought discretionary review from the Washington Supreme Court of the court's decision to dismiss her equal protection and public policy claims against the Hospital and Dr. Guess. The Hospital also sought review of the court's refusal to dismiss the employee handbook and due process claims.

A Supreme Court commissioner denied review, stating that it did not appear that the case would be significantly streamlined by an early consideration of the equal protection and public policy issues. Additionally, the commissioner stated that Ms. Davis did not demonstrate that the superior court had committed obvious or probable error in dismissing her claims.

In response, Ms. Davis moved the superior court to dismiss with prejudice her employee handbook and due process claims in order to perfect her appeal as a matter of right from a final judgment. The court granted the motion and this appeal followed. In it, Ms. Davis contends the superior court erred when it dismissed her equal protection

claims against both Dr. Guess and the Hospital, and her claim against the Hospital that its actions violated Washington public policy.

## ANALYSIS

■ ■ *Standard of Review.* In reviewing a summary judgment, we engage in the same inquiry as the trial court. *Snohomish County v. Anderson,* 124 Wn.2d 834, 843, 881 P.2d 240 (1994). The facts and all reasonable inferences from the facts are construed in favor of the nonmoving party, Ms. Davis. *Id.* We do not weigh the evidence or determine the truth of the matter; the only question is whether there is a genuine issue for trial. A motion for summary judgment should be granted only if the court concludes that reasonable persons would reach but one conclusion based on the facts and reasonable inferences therefrom. *Id.*

■ ■ *42 U.S.C. § 1983.* Ms. Davis claims the Hospital and Dr. Guess violated 42 U.S.C. § 1983. To establish a cause of action under 42 U.S.C. § 1983, Ms. Davis must show: (1) the defendant violated a federal constitutional or statutory right, and (2) the defendant acted under color of state law. Here, Ms. Davis argues that the Hospital and Dr. Guess violated the Equal Protection Clause of the United States Constitution. In considering this claim, we first address whether Ms. Davis has raised a material issue of fact as to whether either of the defendants acted under color of state law. While the ultimate determination of whether the Hospital and Dr. Guess are state actors is a question of law, if a factual dispute underlies that decision, then it cannot be made on summary judgment. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 344 n.7 (4th Cir. 2000), *cert. denied,* 531 U.S. 1126 (2001). If one or both of the defendants were state actors, then we must determine whether Ms. Davis has raised a material issue of fact as to whether the conduct of either or both of the defendants denied her right to equal protection under the laws.

■ *Acting under Color of State Law*. Ms. Davis contends the Hospital and Dr. Guess were state actors for purposes of § 1983. A person acts under color of state law when the person exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941).

■ THE HOSPITAL. There are three recognized circumstances in which a governmental entity, like the Hospital, may be sued under § 1983. *Fuller v. City of Oakland*, 47 F.3d 1522, 1533-34 (9th Cir. 1995). First, Ms. Davis could show that the challenged conduct was the result of the Hospital's official policy or the result of a custom so pervasive that it constituted policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Second, she could establish that the challenged conduct was the result of "a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). Finally, Ms. Davis could demonstrate that, as to the challenged conduct, the Hospital's policy makers either delegated policy-making authority to a subordinate or ratified a subordinate's decision. Such a delegation or ratification would indicate that the Hospital approved the "decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988).

Ms. Davis does not produce evidence of any official policy of the Hospital encouraging or condoning employment discrimination on the basis of sexual orientation. Rather, she contends the discriminatory treatment of her was so pervasive and widespread that it amounted to an unlawful custom of discrimination. Additionally, she claims the Hospital ratified Dr. Guess's harassment of her by failing to respond promptly and appropriately once it became aware of his conduct. She asserts the Hospital, by reducing her hours and then terminating her, adopted Dr. Guess's antilesbian bias as its own.

■ Even without an official policy, the Hospital may have acted under color of state law if a policy of unlawful discrimination can be attributed to it through the actions of its policy-making officials. In *Praprotnik*, the Court stated "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id.* at 123. In *Fuller*, the police chief, the official policy maker, ratified a sexually-biased investigation of his lieutenant. *Fuller*, 47 F.3d at 1534. Consequently, the Ninth Circuit reversed summary judgment, stating that "a jury could find that [Police Chief] Hart acted with reckless disregard of Fuller's constitutional right not to have her investigation handled in a sexually-biased fashion." *Id.* at 1535.

Based upon the wording of RCW 70.44.060(10), the Hospital argues that only its Board holds policy-making authority.[1] And, based upon the language of RCW 70-.44.080(1), the Hospital further argues that the role of its administrator is limited to administrative functions.[2] The Hospital notes that while some authority with respect to employment and disciplinary decisions was delegated to Mr. Adams, its administrator, those decisions were ultimately reviewable by the Board. Thus, the Hospital seeks to disassociate itself for § 1983 purposes from the actions of both Dr. Guess and Mr. Adams.

---

[1] RCW 70.44.060(10) states the Board has authority:

"To make contracts, employ superintendents, attorneys, and other technical or professional assistants and all other employees; to make contracts with private or public institutions for employee retirement programs; to print and publish information or literature; and to do all other things necessary to carry out the provisions of this chapter."

[2] RCW 70.44.080(1) states:

"The superintendent shall be the chief administrative officer of the public district hospital and shall have control of administrative functions of the district. The superintendent shall be responsible to the commission for the efficient administration of all affairs of the district. In case of the absence or temporary disability of the superintendent a competent person shall be appointed by the commission. The superintendent shall be entitled to attend all meetings of the commission and its committees and to take part in the discussion of any matters pertaining to the district, but shall have no vote."

The following facts are relevant to our consideration of the Hospital's argument. After Ms. Davis and Ms. Miguel separately complained about Dr. Guess's treatment of Ms. Davis, Mr. Adams and the Hospital's chief of staff met with Dr. Guess. They instructed him to discontinue his objectionable behavior. Additionally, they implied that if the conduct continued, the Hospital could refer him for formal disciplinary action. In response, Dr. Guess restructured his work procedures and schedule so as to minimize his contact with Ms. Davis. As a consequence, part of the work normally performed by Ms. Davis was eliminated. Accordingly, the Hospital reduced Ms. Davis's position from full time to three-fourths time.

After Ms. Davis's hours were reduced, she filed a grievance that was initially handled by Mr. Adams. As part of the grievance process, Ms. Davis sought to gather information that might demonstrate that Dr. Guess's refusal to work with her was motivated by an antilesbian bias. To that end, she photocopied the outside page of a patient file jacket and a page of an emergency department notation. She shared this information with her attorney. Also, she solicited patient information from physicians and explained her conduct by characterizing the inquiries as a quality assurance survey.

When Mr. Adams learned about Ms. Davis's efforts, he disciplined her for breach of patient confidentiality. Suspending her for three days without pay, he informed her: "As part of the conditions for your return to the hospital, we are now requiring that you schedule your work time in the department to be when Dr. Charles Guess is not working in the department." CP at 2236. The day after suspending Ms. Davis, Mr. Adams changed his mind about the severity of the offense and he terminated her.

In response to Mr. Adams's termination of her, Ms. Davis asked the Board to review his decision. In upholding the decision of its administrator, the Board explained:

> You did breach the confidentiality of patient records. *You also, over time, became a disruptive employee: Toward the end of your*

*employment several very troublesome things occurred. Several written complaints about Dr. Guess were submitted to the Administration by individuals in response to your solicitations. Other employees [came] to the Administration to express their discomfort in working with you because of your repeated solicitations of them to become embroiled in the dispute with Dr. Guess. It appears as though you had a personal campaign to discredit Dr. Guess* and cause departmental — and Hospital-wide disruptions. . . . A reasonable interpretation of this "QA Study" was that it was a part of your campaign to discredit Dr. Guess. At a minimum, it was highly disruptive in the context of your relationship with him and any reasonable person would have known it would be and would not have conducted such a study at such a time if they were acting in good faith.

In light of the evident disruptions within the Hospital caused by you and considering your behavior over a period of several months which appeared to escalate the conflict, we find that the Administration's action in terminating your employment was reasonable and justified.

CP at 2238-39 (emphasis added). Now, in this appeal, the Hospital emphasizes patient confidentiality as the justification for Ms. Davis's termination. But, at the time, much of the emphasis was upon her relationship with Dr. Guess and *her inability to work with him.*

When viewed in the light most favorable to Ms. Davis, the evidence and the inferences from the evidence would support the following findings. Dr. Guess refused to work with Ms. Davis because she was a lesbian. Although Dr. Guess expressed concerns about Ms. Davis's qualifications and work performance, the real motivation for his conduct and the manner in which he treated Ms. Davis was his animosity toward lesbians. Mr. Adams, the Hospital's Administrator, was aware both of Dr. Guess's bias against Ms. Davis and his treatment of her. Although he instructed Dr. Guess to discontinue his objectionable conduct, he also accommodated the conduct by reducing Ms. Davis's hours so that Dr. Guess need not work with her. This accommodation of Dr. Guess's antilesbian bias is also shown by the treatment of Ms. Miguel, whose position was eliminated as part of a

Hospital reorganization, after she complained about Dr. Guess's conduct. Finally, when Ms. Davis complained about Dr. Guess's treatment of her and the reduction of her work hours, Mr. Adams and, ultimately, the Hospital's Board terminated her because she could not get along with him and because of her "campaign to discredit Dr. Guess." CP at 2238. These findings would support a conclusion that the Hospital adopted and ratified the conduct of Mr. Adams and Dr. Guess as its final policy with respect to the treatment of Ms. Davis that was based upon her sexual orientation. *See Praprotnik*, 485 U.S. at 126-27; *Pembaur*, 475 U.S. at 483-84.

Therefore, material issues of fact exist that are pertinent to the ultimate determination of whether the Hospital's conduct here amounted to state action.

 DR. GUESS. To establish the liability of an individual defendant under § 1983, Ms. Davis must show both that Dr. Guess deprived her of a protected right and that he caused the deprivation while acting under color of state law. 42 U.S.C. § 1983 (1994); *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981). Normally, the second element is demonstrated by showing that a public employee abused the position given to him or her by the state while acting in an official capacity. However, the color of law requirement is not satisfied if the offensive act is a private tort committed by a state employee. Rather, the act must entail " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Barkauskie v. Indian River Sch. Dist.*, 951 F. Supp. 519, 541 (D. Del. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995)). Before the conduct of a private actor can be considered state action, the court must find a "sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself.' " *Jensen v. Lane County*, 222 F.3d 570, 575 (9th Cir. 2000) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)).

■ Like the physician in *Nieto v. Kapoor*, 268 F.3d 1208 (10th Cir. 2001), Dr. Guess argues he is not liable under § 1983 because he is not a Hospital employee. In *Nieto*, female employees of the radiation oncology department sued the hospital and Dr. Quadrat Kapoor, the department's medical director, for sexual harassment. Like Dr. Guess, Dr. Kapoor was not an employee of the hospital, but worked under a contractual agreement with the hospital by the terms of which he oversaw the medical care provided in the hospital's radiation oncology department. Like Dr. Guess, Dr. Kapoor did not have any authority to hire, fire, or discipline hospital employees, but he influenced staffing decisions. Finally, like Dr. Guess, Dr. Kapoor argued that he was not liable under § 1983 because he was not a state actor. In holding that Dr. Kapoor was a state actor, the court agreed with the trial court's reasoning that " 'Dr. Kapoor was able to harass Plaintiffs because of his state authority as the Medical Director of a public radiation oncology department and because he supervised their work.' " *Id.* at 1217.

Was Dr. Guess able to harass Ms. Davis because of his state authority as the medical director of the department in which she worked? Again, we must view the evidence in the light most favorable to Ms. Davis. As the physician responsible for overseeing the quality of care within the radiology department, Dr. Guess exercised significant control over Ms. Davis. By accepting her and working with her, he could ensure her success within the department. Or, by rejecting both her and her work, he could ensure her failure. A fact finder could find that Dr. Guess chose the latter course.

Moreover, the evidence supports Ms. Davis's contention that Dr. Guess's authority within the radiology department was considerable. We have previously noted that Ms. Miguel's position was eliminated after she complained about Dr. Guess's treatment of Ms. Davis. Ms. Miguel's predecessor as the radiology department manager was Laura Johnson. According to Ms. Johnson, she lost her position and was demoted to a part-time employee after a

disagreement with Dr. Guess. Ms. Johnson attributes both her demotion and her replacement by Ms. Miguel to Dr. Guess's influence. If this evidence is accepted by the jury, it could infer from this evidence that Dr. Guess exercised greater real authority within the radiology department than its actual manager. The jury could find that Dr. Guess was able to adversely impact the conditions of Ms. Davis's employment because of his position in the Hospital and the authority granted to him by the state.

As with the Hospital, material issues of fact exist that are pertinent to the ultimate question of whether Dr. Guess's conduct here amounted to state action.

 *Equal Protection.* In granting summary judgment, the trial court questioned whether there is a right in the public workplace to be free from harassment or discrimination based upon sexual orientation. The Equal Protection Clause of the Fourteenth Amendment requires similar treatment under the law for similarly situated people. U.S. CONST. amend. XIV, § 1; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985); *State v. Ward*, 123 Wn.2d 488, 515, 869 P.2d 1062 (1994). Ms. Davis contends that employment discrimination based upon sexual orientation violates her right to equal protection. She further claims that even under the most relaxed level of judicial scrutiny—rational basis—her claim is actionable under § 1983 because the Hospital and Dr. Guess offer no legitimate state purpose that justifies discriminating against her because of her sexual orientation.[3]

---

[3] The courts apply one of three standards—strict scrutiny, intermediate scrutiny, and rational basis—to equal protection claims. *State v. Thorne*, 129 Wn.2d 736, 771-72, 921 P.2d 514 (1996). In a footnote to her brief, Ms. Davis observes the level of scrutiny to be applied to classifications based on sexual orientation is an open question in Washington. She further states that because there is a long history of employment discrimination against gay and lesbian people, classifications that implicate them should be subject to a heightened level of scrutiny. Despite the observations about heightened scrutiny contained in her footnote, Ms. Davis's position is that the discrimination about which she complains—discrimination based upon sexual orientation in public employment—does not bear even a rational relationship to a legitimate governmental interest.

█ █ "Under the rational relationship test, a classification will be upheld unless it rests on grounds wholly irrelevant to the achievement of legitimate state objectives." *Gossett v. Farmers Ins. Co.*, 133 Wn.2d 954, 979, 948 P.2d 1264 (1997). A discriminatory classification that is based on prejudice or bias is not rational as a matter of law. *Romer v. Evans*, 517 U.S. 620, 633-34, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996); *Cleburne*, 473 U.S. at 448; *Palmore v. Sidoti*, 466 U.S. 429, 432-33, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984).

█ In *Romer*, the Supreme Court held that an amendment to the Colorado State Constitution, which prohibited any legislation or judicial action designed to protect the status of a person based upon sexual orientation, violated the Equal Protection Clause of the United States Constitution. In so holding, the Court observed that under the rational basis standard, the court would "insist on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. But, this link was lacking in *Romer*. Therefore, the court drew the "inevitable inference" that the law is "born of animosity toward the class of persons affected." *Id.* at 634. The Court characterized the Colorado amendment as "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.* at 635. *Romer* holds state actions that treat homosexuals less favorably than other groups must advance some legitimate governmental interest.

█ Other courts also have held that discrimination on the basis of sexual orientation can state a claim under the Equal Protection Clause. For instance, in *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996), the court held that the trial court had improperly dismissed on summary judgment an equal protection claim based on sexual orientation where a gay student presented evidence that he had been harassed over a long period of time by other students

---

Accordingly, we need not decide whether classifications based upon sexual orientation merit heightened scrutiny.

and, although he had repeatedly complained to school officials, the school took no action to protect him. Similarly, in *Quinn v. Nassau County Police Department*, 53 F. Supp. 2d 347 (E.D.N.Y. 1999), the court found the Nassau County Police Department violated a former police officer's right to equal protection where it allowed years of harassment because of his homosexuality. The district court held that the right of public employees to be free from harassment and discrimination based on sexual orientation is found in the Equal Protection Clause and is actionable under § 1983.

Based upon the above authority, we hold that a state actor violates a homosexual employee's right of equal protection when it treats that person differently than it treats heterosexual employees, based solely upon the employee's sexual orientation. The alleged violation of the right of equal protection is actionable under § 1983.

■■■ Here, the Hospital and Dr. Guess do not offer any justification for employment discrimination based upon sexual orientation. They argue that their actions were based on considerations other than Ms. Davis's sexual orientation. The Hospital claims that it terminated Ms. Davis because she violated its rules concerning patient confidentiality and because she was a disruptive employee. Dr. Guess asserts that he refused to work with Ms. Davis for professional and personal reasons. Significantly, they have not produced any evidence nor do they even argue that treating Ms. Davis differently based upon her sexual orientation would serve a legitimate purpose.

Rather, the Hospital and Dr. Guess assert that Ms. Davis's claims do not survive their motions for summary judgment because she was fired for copying and sharing patient records and for being a disruptive employee, not because she is a lesbian. Cases involving Title VII of the 1964 Civil Rights Act have established a procedural framework for deciding sexual harassment cases in the employment context. *Bator v. Hawaii*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994). That framework is useful here, as well. First, the plaintiff must establish a prima facie case of discrimina-

tion. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Id*. Finally, if the defendant puts forth a legitimate, nondiscriminatory reason, then the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely pretext for illegal discrimination. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 182, 23 P.3d 440 (2001) (citing *McDonnell Douglas*, 411 U.S. at 804).

The Hospital has provided a legitimate, nondiscriminatory reason for the termination of Ms. Davis's employment. The employee handbook clearly states that improper dissemination of patient information is an offense punishable by termination. In turn, Ms. Davis has provided evidence of pretext. This evidence includes Dr. Harrington's declaration that Mr. Adams responded, " '[w]e need to do something about it and we will,' "[4] to Dr. Guess's statement: " 'I don't think a queer should be doing vaginal exams.' "[5] It also includes what the jury might infer from the fact that Mr. Adams's initial discipline of Ms. Davis for breach of patient confidentiality was a three-day suspension, with the apparently unrelated admonition that "we are now requiring that you schedule your work time in the department to be when Dr. Charles Guess is not working in the department."[6] A similar inference flows from the fact the Board, in affirming the decision to fire her, cited Ms. Davis's inability to work with Dr. Guess and its perception of her as a disruptive employee.

After viewing the evidence in the light most favorable to Ms. Davis, we hold she has raised a material issue regarding whether the Hospital's asserted reasons for firing her

---

[4] CP at 1367.

[5] CP at 1367.

[6] CP at 2236.

were pretextual. The dismissal of Ms. Davis's § 1983 claim against the Hospital is reversed and remanded for trial.

■ Finally, we consider Dr. Guess's argument, offered for the first time in his brief on appeal, that he enjoyed a qualified immunity from this type of suit because in 1994 it was not well established that discrimination based upon sexual orientation violated a person's right to equal protection. He cites *Bator* for the proposition that "[q]ualified immunity protects state officials from section 1983 liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bator*, 39 F.3d at 1027 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). However, *Bator* held that no qualified immunity existed to protect the defendants from a suit alleging sexual harassment. *Bator* pointed out that "[b]y the mid-1970s, the Supreme Court had announced that the Equal Protection Clause proscribes purposeful discrimination by state actors, . . . based solely on an individual's membership in a protected class." *Bator*, 39 F.3d at 1027 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)).

In *Nabozny*, the court applied similar reasoning to dispose of a defendant's claim of qualified immunity from suit based upon sexual orientation harassment. The court stated as follows:

> Our discussion of equal protection analysis thus far has revealed a well established principle: the Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a rational basis for the discrimination. There can be little doubt that homosexuals are an identifiable minority subjected to discrimination in our society. Given the legislation across the country both positing and prohibiting homosexual rights, that proposition was as self-evident in 1988 as it is today.

*Nabozny*, 92 F.3d at 457 (footnote omitted).

We agree with the court in *Nabozny*. The law is well established that intentional and invidious discrimination against an individual because he or she is a member of an identifiable class violates that person's right to equal protection. That proposition was as evident in 1994 as it is today. Dr. Guess has no qualified immunity from Ms. Davis's § 1983 action. The dismissal of Ms. Davis's § 1983 claim against Dr. Guess is reversed and remanded for trial.

*Washington Public Policy.* Ms. Davis argues that the Hospital violated Washington public policy by discharging her because of her sexual orientation. In rejecting this argument and granting summary judgment, the trial court held that even if Ms. Davis was discharged because of her sexual orientation, such a discharge does not violate a clear mandate of public policy in Washington. We agree.

The determination of what constitutes a clear mandate of public policy is a question of law. *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989). The employee bears the burden of establishing the existence of a clear mandate of public policy and that his or her discharge contravenes or jeopardizes that public policy. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (citing *Dicomes*, 113 Wn.2d at 617). Courts are required to find, not create public policy, "and the existence of such public policy must be 'clear.' " *Selix v. Boeing Co.*, 82 Wn. App. 736, 741, 919 P.2d 620 (1996) (quoting *Roe v. Quality Transp. Servs.*, 67 Wn. App. 604, 610, 838 P.2d 128 (1992)).

In support of her argument that discharging a public employee based on his or her sexual orientation contravenes a clear mandate of Washington public policy, Ms. Davis relies on the general principles of equal protection and the right to privacy. Additionally, she points to RCW 9A.36.078, which deals with crimes motivated by bigotry and bias, and state regulations governing public employee benefits, which now include same sex domestic partners as eligible dependents.

While this body of law shows some trend in our state toward a public policy that would prohibit the government from discriminating against its citizens because of their sexual orientation, the trend is insufficient to establish a clear mandate of public policy. We are mindful of the admonition that we should " *'proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.'* " *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984) (quoting *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380, 652 P.2d 625 (1982)). Our Legislature has enacted many laws regulating public employment and it has not elected to prohibit discrimination because of sexual orientation.

In this case, Ms. Davis has not met her burden of establishing that her discharge violates a clear mandate of Washington public policy. For that reason, we conclude that the court properly dismissed her claim based upon public policy.

*Attorney Fees.* 42 U.S.C. § 1988 permits the court, in its discretion, to award attorney fees to the party who prevails in a suit to enforce § 1983. *Dennis v. Chang*, 611 F.2d 1302, 1305 (9th Cir. 1980). The issue of whether Ms. Davis is entitled to an award of attorney fees shall be determined by the trial court upon remand.

KATO, A.C.J., and SCHULTHEIS, J., concur.

Review denied at 148 Wn.2d 1019 (2003).