The Honorable David Bisbee State Senator 14068 Pyramid Drive Rogers, Arkansas 72758-0116
Dear Senator Bisbee:
I am writing in response to your request for an opinion on five questions regarding a proposed new state funding formula for services for delinquent and at-risk youth. Specifically, you state that the Division of Youth Services (DYS) of the Arkansas Department of Health and Human Services (DHHS) "is considering changing its formula for services to delinquent and at-risk youth." You state the following information as background for your questions:
 DYS has a budgeted amount of money for each fiscal year (FY) to provide services to youth in each judicial district. The funding formula is based on 2000 census data. This formula uses two (2) categories of funding for each judicial district, the population of youth and the poverty population of youth. Both categories rely on 2000 census data.
 One of the proposals considered by DYS/DHHS was a change to the funding formula to distribute the moneys using the most current year's census data
instead of 2000 census data to address the population changes across the state. This is an important issue in my district and the rest of Northwest Arkansas, as well as other areas that have experienced high population growth in the last six (6) years, because the most current census data and the projected census data for 2010 has shown a significant increasing of the population in Northwest Arkansas. This increase is putting a strain on the ability of the courts to obtain the services necessary for the youth. Furthermore, the increase in population is straining the ability of the state to deliver the necessary services to the youth.
 The proposal to use the most current year's census data was abandoned, and it is not the subject of this opinion request specifically. DYS/DHHS is now recommending a different funding formula that is based on additional prorated categories for new funding only and 2000 census data.
 First, the newly recommended funding formula is limited in applicability. The new formula only applies to new money for FY2008 and FY2009, which may or may not be obtained by DYS. In 2010 and only if the base level of funding increases significantly, DYS will switch to the new formula entirely. This is considered a "safety net" to ensure continued funding at existing levels to existing providers.
 Second, the money that is under the new formula is classified into four (4) different categories, to be distributed to each judicial district according to a formula based on 2000 census data. The categories of funding are:
 — 60% Population 5-17 year olds
 — 30% Poverty 5-17 year olds
 — 5% Court Involvement
 1.25% Delinquents
 1.25% FINS
 2.5 % Diversions (definition clarified for uniformity)
 — 5% High School Dropouts
 The money would then be distributed to each judicial district on a prorated basis using the 2000 census data.
(Emphasis original).
You pose five questions relating to these facts, as follows:
 1. Does the proposed new funding formula's "safety net" that limits the applicability of the new formula to new money only and essentially sets the current funding level as a minimum level of funding for each judicial district raise constitutional or other legal concerns?
 2. If the "safety net" in the proposed new formula provides continued funding at the current level to providers in the areas of the state with a decreasing percentage of the state's youthful population and if the "safety net" denies any additional funding to providers in the state with an increasing percentage of the state's youthful population, then would the "safety net" cause constitutional or other legal concerns, primarily under Article 2, Sections 3 and 18 of the Arkansas Constitution but including any other similar legal issues?
 3. Does the proposed new formula raise constitutional or other legal concerns because it uses 2000 census data, instead of current census data that is available, to determine the amount of services that a judicial district can use for services to at-risk youth?
 4. If the use of 2000 census data, instead of current census data that is available, will reduce the amount of funding available per capita to areas of the state that have had a significant increase in the percentage of the state's youthful population to provide services to at-risk youth and if the use of the 2000 census data will increase the amount of funding available per capita to areas of the state that have a significant decrease in the percentage of the state's youthful population to provide services to at-risk youth, then would the use of the 2000 census data cause constitutional or other legal concerns, primarily under Article 2, Sections 3 and 18 of the Arkansas Constitution but including any other similar legal issues?
 5. If the new formula results in areas of the state with an increasing percentage of the state's youthful population, as determined by the most current census data available, with less per capita funding for at-risk youth than in areas of the state with a decreasing youthful population, then would the use of 2000 census data cause constitutional or other legal concerns, primarily under Article 2, Sections 3 and 18 of the Arkansas Constitution but including any other similar legal issues?
RESPONSE
In my opinion the answer to each of your questions is in all likelihood "no."
Question 1 — Does the proposed new funding formula's "safetynet" that limits the applicability of the new formula to newmoney only and essentially sets the current funding level as aminimum level of funding for each judicial district raiseconstitutional or other legal concerns?
It is difficult to address this question without reference to the exact language of the formula in question. You have not indicated whether this formula would be adopted as a part of a legislative act, agency rule or regulation, or simply as an internal agency formulation to direct distribution of the funds. According to my research and understanding, there is no Arkansas statute, regulation, or any relevant federal directives embodying the current formula, or dictating the method of distribution of the funds in question.[1] Against this backdrop, you have merely asked whether the relevant state agency's proposed distribution of the funds in the manner described would "raise constitutional or other legal concerns." In the absence of any applicable state or federal statute or regulation, your first question essentially boils down to whether the proposed distribution formula violates any constitutional principle. In my opinion the answer to this question is in all likelihood "no."
You have described the proposed change in the funding formula as entailing a frozen "base level of funding" based on 2000 census figures, to serve as a "safety net" to ensure continued funding at existing levels to existing providers. You then state that any newly available moneys over this amount will be distributed according to the new formula, also according to 2000 census figures.[2] At such time that the "base level of funding increases significantly," you have stated that DYS will switch to the new formula entirely. I assume from this statement that before the new formula can be applied to all moneys, existing providers would have to be guaranteed the current level of funding under its application. Your obvious concern is whether this proposal unconstitutionally slights districts with growing populations out of a proportional level of funding for delinquent and at-risk youth. In my opinion the answer is in all likelihood "no."
As an initial matter, there is no Arkansas or United States Constitutional provision guaranteeing any particular level of funding to judicial districts for funding of delinquent or at-risk youth. I have found no constitutional provision that purports to guarantee a proportional level of funding for such services. In the absence of any such provision, the issue must be analyzed under any other potentially generally applicable provisions, such as the equal protection, due process, or privileges and immunities clauses of the United States or Arkansas Constitution. See U.S. Const. Amendment 14, § 1 and Arkansas Constitution article 2, §§ 3, 8, and 18. In my opinion, however, these provisions have no applicability to the extent they are sought to be invoked by a judicial district in an effort to obtain more proportional funding.
As I stated in Op. Att'y Gen. No. 2003-251:
 It is settled that "[a] political subdivision of a state cannot invoke the protection of the fourteenth amendment against the state." Delta Special School District No. 5 v. State Board of Education, 745 F.2d 532 (8th Cir. 1984); and Arkansas State Hospital v. Goslee, 274 Ark. 168, 623 S.W.2d 513 (1981), citing Alexander Milburn Co. v. Davis-Bournonville, 270 U.S. 390 (1926); City of Trenton v. New Jersey, 262 U.S. 182 (1923); and City of New York v. Richardson, 473 F.2d 923 (2d Cir. 1973), cert. denied, 412 U.S. 950 (1973).
Id. at 2. See also, Deadrick v. Parker, 211 Ark. 394,200 S.W.2d 787 (1947) (a city is not a citizen for purposes of Arkansas Constitution, art. 2, § 18) and Saint Louis, I.M. SRailroad v. Board of Directors, 103 Ark. 127, 145 S.W. 892
(1912) (a levee district is not a "citizen" for purposes of article 2, § 18).
In my opinion, therefore, a constitutional argument of this nature raised by a political subdivision or governmental entity would not succeed.
To the extent that a "person" or "citizen" brought a challenge alleging unconstitutional discrimination, the applicable standard applied would in my opinion be a mere "rational basis review."
As I stated in Opinion 2006-004:
 As I recently stated in Op. Att'y Gen. 2004-066:
 "Discrimination," in the legal context, arises out of the constitutional principle of "equal protection," which is set forth in the 14th Amendment to the United States Constitution, and in Article 2, §§ 2
and 3 of the Arkansas Constitution. The equal protection doctrines of both the Arkansas and the U.S. Constitutions prohibit certain types of "classifications." A classification is the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrines. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class (such as a particular racial group, see, e.g., Loving v. Virginia, 388 U.S. 1 (1967)) or a fundamental right (such as the right to vote, see Dunn v. Blumstein, 405 U.S. 330 (1972)), it is necessary to show that the disparity is arbitrary. That is, the disparity must be shown to have no rational basis — no rational relation to a legitimate end. Fitzgerald v. Racing Assn. of Central Iowa,
02-695, (U.S. 2003); Vacco v. Quill, 521 U.S. 793
(1997); Romer v. Evans, 517 U.S. 620, 631 (1996); Clements v. Fashing, 457 U.S. 957 (1982); Seagrave v. Price, 349 Ark. 433, 79 S.W.3d 339 (2002); Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22
(1998). Economic classifications are usually subjected to the rational basis standard of scrutiny. Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985).
 In applying the rational basis standard, the courts must not only presume the constitutionality of the challenged classification, but they must also uphold the classification even without requiring a showing of an actual rational basis, if any conceivable rational basis for the scheme can be adduced — even a hypothetical one. Eady v. Lansford, 351 Ark. 249, 92 S.W.3d 57 (2002); Ester v. National Home Ctrs., Inc., 335 Ark. 356, 981 S.W.2d 91 (1998); Reed v. Glover, 319 Ark. 16, 889 S.W.2d 729 (1994); Fayetteville Sch. Dist. v. Arkansas State Bd. of Educ., 313 Ark. 1, 852 S.W.2d 122 (1993); Arkansas Hospital Assoc. v. State Board of Pharmacy, 297 Ark. 454, 763 S.W.2d 73 (1989).
Id. at 2.
In my opinion the proposed formula you describe would in all likelihood be upheld under this standard. The case of Hall v.Fisher, 285 Ark. 222, 685 S.W.2d 803 (1985), may be instructive in this regard. At issue in Hall was the statutory formula developed to distribute state revenues to counties as county turnback funds. As stated by the court:
 Since the enactment of the 1973 Revenue Stabilization Act, the formula for distribution has been to divide 75% of the funds equally among the 75 counties and to divide the other 25% proportionately by population according to the most recent federal decennial census. Ark. Stat. Ann. 13-523(C) (Repl. 1979).[3]
Id. at 222-223.
The plaintiffs, Pulaski County taxpayers, sued, alleging that the "distribution formula ha[d] no rational basis and [was] therefore an illegal exaction and a denial of equal protection."Id. at 223. The Arkansas Supreme Court first invoked U.S. Supreme Court precedent to the effect that "if a classification in economic legislation has some reasonable basis, it is not invalid even though it lacks mathematical nicety and results in some inequity." Id. at 223, referring to Schweiker v. Wilson,450 U.S. 221 (1981). The court then quoted from Schweiker as follows:
 This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary.
Id. at 223, quoting Schweiker at 234.
The Arkansas Supreme Court in Hall then stated that the Pulaski County taxpayers claim of unconstitutionality "center[ed] on proof that, although its population [gave] it the largest sum received by any county in turnback aid, on a per capita basis it received, in 1982 for example, only $2.63 per person, the lowest amount for any county, in contrast with the maximum of $33.24 per person received by Calhoun County." Id. The court upheld the statutory formula nonetheless, stating:
 All the proof shows, however, that population is by no means the only factor to be considered. Primarily, turnback funds reimburse the counties at least in part for the cost of services that counties are required by state law to provide. Among the services specifically mandated are the administration of justice by means of the courts, law enforcement protection, the maintenance of jails, the assessment and collection of property taxes, the keeping of public records, and all services required to be performed by county officers and departments. Ark. Stat. Ann. 17-3802 (Repl. 1908).
 * * *
 The existing formula undoubtedly benefits the poorer and less populous counties at the expense of the richer and more populous ones, but the evidence does not show that such a state policy is without a rational basis. Moreover, there are indications that still other weighty factors to be considered in arriving at a fair distribution formula include comparative local wealth, total assessed property values with possible adjustments for differences in the percentage of market value being assessed, the extent to which the residents of each county have taxed themselves to the full extent allowed by state law, and the total area of federally owned tax-exempt land within each county. For the most part, those important elements in the general problem cannot be determined with any measure of certainty, so that among many possible formulas there is necessarily much leeway for the exercise of sound legislative judgment.
 * * *
 Perhaps a larger allocation on the basis of population might have been more equitable, but that is a determination to be made by the General Assembly, where all the counties are represented by comparative population, not by the courts on the basis of the testimony in this case.
Id. at 224-226.
In my opinion, similarly, the proposed formula for distribution of funds for delinquent and at-risk youth cannot be said to lack a rational basis. Executive or legislative officials charged with developing the formula will be given leeway in developing the policy, and it will be upheld if any rational basis supports it, even a hypothetical one. I cannot state, certainly without any factual record upon which to do so, that the proposed formula lacks any rational basis.
Question 2 — If the "safety net" in the proposed new formulaprovides continued funding at the current level to providers inthe areas of the state with a decreasing percentage of thestate's youthful population and if the "safety net" denies anyadditional funding to providers in the state with an increasingpercentage of the state's youthful population, then would the"safety net" cause constitutional or other legal concerns,primarily under Article 2, Sections 3 and 18 of the ArkansasConstitution but including any other similar legal issues?
This question is materially indistinguishable from your first question, and in my opinion the answer to it is also in all likelihood "no."
Question 3 — Does the proposed new formula raise constitutionalor other legal concerns because it uses 2000 census data, insteadof current census data that is available, to determine the amountof services that a judicial district can use for services toat-risk youth?
I have not found any statute or other provision of law making it unlawful to utilize federal decennial census information in fashioning the formula in question.[4] Again, there are, according to my research, no statutes or provisions of law dictating the required components of the formula in question (but see fn.1, supra), or the criteria that must be utilized in shaping it. In addition, I have not found any generally applicable statute dictating a general preference for more recent special or other census information over the federal decennial census. Consequently, your question must again turn solely on constitutional principles. I have found no authority suggesting a constitutional imperative to utilize more recent census data in this context. A "rational basis" review would be the applicable standard. As discussed above, therefore, in my opinion, the answer to this question is also "no."
Question 4 — If the use of 2000 census data, instead of currentcensus data that is available, will reduce the amount of fundingavailable per capita to areas of the state that have had asignificant increase in the percentage of the state's youthfulpopulation to provide services to at-risk youth and if the use ofthe 2000 census data will increase the amount of fundingavailable per capita to areas of the state that have asignificant decrease in the percentage of the state's youthfulpopulation to provide services to at-risk youth, then would theuse of the 2000 census data cause constitutional or other legalconcerns, primarily under Article 2, Sections 3 and 18 of theArkansas Constitution but including any other similar legalissues?
This question is materially indistinguishable from your first, second and third questions, and in my opinion the answer is also in all likelihood, "no."
Question 5 — If the new formula results in areas of the statewith an increasing percentage of the state's youthful population,as determined by the most current census data available, withless per capita funding for at-risk youth than in areas of thestate with a decreasing youthful population, then would the useof 2000 census data cause constitutional or other legal concerns,primarily under Article 2, Sections 3 and 18 of the ArkansasConstitution but including any other similar legal issues?
This question is materially indistinguishable from your previous questions. In my opinion the answer is similarly, in all likelihood, "no."
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB: ECW/cyh
[1] But see generally, A.C.A. § 20-76-603 (Supp. 2005) (authorizing the "Community Oversight and Planning Council" to make recommendations for community-based service funding for youth services needs); and A.C.A. § 9-28-702 (Repl. 2002) (requiring the Division of Youth Services to ensure that each judicial district has a "continuum of [`community based'] sanctions available through its contracts with community-based providers" to provide alternatives to the commitment of juveniles to the Division of Youth Services, and to ensure the maximum use of resources in each judicial district "to make community-based sanctions available to as many juveniles as possible"). This latter directive appears to apply to a portion of the funding at issue.
[2] It is my understanding, contrary to your assertion, that the proposed formula in fact entails using more recent census information in distributing any newly available funds. I should note, however, that you have not indicated and I am therefore uncertain what form this new census information would take, It is not clear whether your reference to "the most current year's census data" refers to some type of special census or other later official publication.
[3] The statute was later amended to allow the use of special census information for county turnback funds. See A.C.A. §19-5-602 (c)(1)(A).
[4] As I noted in footnote 1, it is my understanding that the portion of the formula applying to "new" revenues will utilize census data more recent that the 2000 census figures, although again, it is not clear from your question what form this more recent census data takes.