The Honorable Gary L. Smith State Representative
600 Ouachita 31 Camden, AR 71701-9561
Dear Representative Smith:
I am writing in response to your request for my opinion on the following question:
 Is it legally permissible for the Arkansas Department of Finance and Administration and its subdivision, the Office of Child Support Enforcement, to provide uniform grievance and alternative dispute resolution procedures to certain employees and deny access to the uniform grievance and alternative dispute resolution procedures to other employees based solely on their professional licensure and supervisory role?
My inquiries reveal that the Office of Child Support Enforcement (the "OCSE"), reportedly in order to ensure the confidentiality of communications between and among its managers, licensed professional staff and agency clients, has established for those managerial and licensed personnel a grievance procedure that differs from that available to other employees under what you term "uniform grievance and alternative dispute resolution procedures." The material you have provided me does not detail precisely how the grievance procedures at issue differ from each other. My inquiries reveal that the Office of Personnel Management ("OPM") at the Department of Finance and Administration ("DFA") has approved the OCSE policy, including the differing procedures applicable to different categories of employees. *Page 2 
RESPONSE
The distinction between categories of employees drawn in the applicable grievance policies does not appear to implicate a suspect class or a fundamental right, meaning that classifying these employees differently would be subject to a minimal "rational basis" standard of review in the face of any equal protection challenge. In my opinion, although only a finder of fact could determine whether drawing the precise distinctions at issue reasonably serves a legitimate governmental end, under the circumstances recited, the mere fact that DFA, subject to OPM approval, has classified these employees differently would in all likelihood withstand an equal protection challenge.
I gather that the "uniform grievance and alternative dispute resolution procedures" referenced in your request are those referenced in Department of Finance and Administration Administrative Memorandum No. 300.3.2 (the "Memorandum"), which in section 2 defines its coverage as including, but not being limited to, "annual leave, sick leave, compensatory time, dismissal, suspension, promotion, demotion, disciplinary actions and discrimination."
For purposes of determining who will be covered under these "uniform grievance and alternative dispute resolution procedures," section 1 of the Memorandum excludes from the category of covered "employee" all "employees who hold administrative posts, appointed positions, and employees who are on initial new hire probationary status." This section elaborates by expressly excluding from the grievance policy the following individuals:
 1) DFA Director, 2) DFA Deputy Director, 3) DFA Revenue Assistant Commissioner, 4) Alcoholic Beverage Control Enforcement Director, 5) Alcoholic Beverage Control Administration Director, 6) Racing Commission Manager, 7) Criminal Detention Facilities Review Coordinator, 8) DFA Administrators Managers, 9) Attorney Supervisors, 10) Attorney Specialists, 11) Attorneys, 12) and anyone occupying a nonclassified position.
The section of the Memorandum captioned "Procedure" directs that any employee grievance under this program be submitted for initial adjudication to the agency grievance officer. Although the Memorandum refers in the section captioned "Documentation" to the "formal procedures" to be followed in hearing a *Page 3 
complaint, the Memorandum fails to itemize what these procedures are. The Memorandum in section 2 acknowledges that the intra-agency disposition of various grievances will be subject to appeal through either the State Grievance Review Committee (the "Committee") or the State Employee Grievance Appeal Panel (the "Panel"), but then forecloses these avenues of appeal when an employee has elected to engage in alternative dispute resolution or mediation,see section 3, or has elected to proceed through the Equal Employment Opportunity Commission or some other legal channel,see section captioned "Procedure." Section 2 further provides,inter alia, that "[c]omplaints about performance evaluations may be appealed utilizing the separate performance evaluation appeals process" — a procedure that, at least initially, reportedly consists of appealing any supervisor's evaluation to the supervisor's own supervisor.
The Memorandum must be read in conjunction with an executive order, EO 86-1, issued by then Governor Clinton, which directs executive agencies to develop, implement and maintain grievance procedures and which sets forth standards for the development of such procedures subject to monitoring by the OPM.[1] Specifically, EO 86-1 directs each state agency, on or before December 1985, to "establish, adopt and implement a written employee grievance procedure," subject to the approval of the OPM Administrator. Section 2 of the order requires each agency to provide a copy of the grievance procedure to "each of its employees" and to "explain to such employees their privileges and responsibilities under such policy." Section (4) broadly defines the scope of the required grievance policy as including, but not being limited to, "annual leave, sick leave, compensatory time, dismissal, suspension, promotion, demotion, working conditions, disciplinary actions, and discrimination." Section (6)a mandates the internal resolution of any grievance within a period of 25 working days, absent an agreement to the contrary. Sections (6)b through (12) establish the Committee to provide an external review of any agency determination within 10 days of submission. However, section (8)c provides that "the final decision in any specific case shall remain with [the] Agency Director." The Committee's role in reviewing a grievance thus appears to be purely advisory. Finally, section (14) charges the Administrator of OPM with developing a standard grievance procedure, whose adoption by any given agency will be deemed to comply with the executive order. *Page 4 
As regards a somewhat narrowed range of grievances, the scope of appellate review of agency action set forth in EO 86-1 is somewhat broadened in EO 93-01. The latter executive order initially notes that EO 86-1, perhaps because of the advisory nature of the Committee's deliberations, "does not provide for a final, administrative review of state agency decisions" involving employee grievances. In an apparent effort to remedy this perceived problem, EO 93-01 establishes the Panel to address a limited range of "covered grievances," itemized in section (5) as including "any grievance which is covered under the provisions of Executive Order 86-1" and which involves allegations of unlawful discrimination, termination of an employee, suspension without pay of an employee, involuntary demotion of an employee, or failure to award compensatory time to an employee. Section (7) mandates that the appeal of any provisional agency determination regarding a covered grievance that falls outside these parameters and involves a covered employee be referred to the Committee for review.
Section (18) of EO 93-01 excludes from coverage a number of state officers and employees, including, in a general catch-all provision, "any other officer or employee of the State as exempted under grievance procedures approved by the Administrator of the Office of Personnel Management. . . ." To the extent, then, that OPM has approved excluding from the grievance procedures those individuals listed in the Memorandum, those exclusions would appear to accord with the directives set forth in EO 93-01. As noted above, my inquiries reveal that the OPM has indeed approved the terms of the Memorandum, including the exclusions from coverage.
Despite the stated intention in EO 93-01 to provide a "final, administrative review" of agency determinations regarding grievances, the Panel created under that order is not the ultimate decision-maker in an appeal from a grievance determination that falls under its jurisdiction. Under EO 86-1, the director of the agency in which the grievance arose has the ultimate decision-making authority on appeal. By contrast, under sections (11) and (13) of EO 93-01, the state's CFO holds this authority with respect to grievances arising outside DFA, as do one or more appointees of the Governor in cases arising outside DFA, apparently subject to ultimate judicial review. See Ball v.Arkansas Department of Community Punishment,340 Ark. 424, 427, 10 S.W.3d 873 (2000) (involving the judicial review of a decision whereby the CFO reversed the Panel's provisional decision). Perhaps most significantly, subject to the constitutional restraint discussed immediately below, under either order, the OPM has the authority to approve whatever grievance procedures it deems suitable within any given agency. *Page 5 
At issue in your request is whether it is constitutionally permissible for DFA to establish differing procedures for reviewing grievances involving different classes of employees. Any "discrimination" of this sort implicates the constitutional guarantee of "equal protection" under the 14th Amendment to the United States Constitution and Article 2, §§ 2 and 3 of the Arkansas Constitution. The equal protection doctrine as set forth in both constitutions prohibits certain types of "classifications." A classification is the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class (such as a particular racial group,see, e.g., Loving v. Virginia, 388 U.S. 1 (1967)) or a fundamental right (such as the right to vote, see Dunn v.Blumstein, 405 U.S. 330 (1972)), it is necessary to show that the disparity is arbitrary. Stated differently, the disparity must be shown to have no rational basis — i.e., no rational relation to a legitimate governmental end. Fitzgerald v. Racing Assn. of CentralIowa, 541 U.S. 1086 (2004); Vacco v. Quill,521 U.S. 793 (1997); Romer v. Evans, 517 U.S. 620 (1996);Clements v. Fashing, 457 U.S. 957 (1982); Seagrave v.Price, 349 Ark. 433, 79 S.W.3d 339 (2002); Craft v. City ofFort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998). In reviewing the constitutionality of a classification that does not affect a suspect class or a fundamental right, a court must not only presume the constitutionality of the challenged classification; it must also uphold the classification even without requiring a showing of an actual rational basis, so long as any conceivable rational basis for the scheme can be adduced — even a hypothetical one.Williamson v. Lee Optical Co., 348 U.S. 483 (1955);Ester v. National Home Ctrs., Inc.,335 Ark. 356, 981 S.W.2d 91 (1998); Reed v. Glover,319 Ark. 16, 889 S.W.2d 729 (1994); Arkansas HospitalAssoc. v. State Board of Pharmacy,297 Ark. 454, 763 S.W.2d 73 (1989). See Ark. Ops. Att'y Gen. Nos. 2007-059 and 2006-027 (generally discussing this standard).
The classifications at issue in your request are not invidious examples of discrimination directed against a suspect class or abridging a fundamental right. It follows that a reviewing court would apply the extremely broad "rational basis" test, under which the challenged program would be upheld so long as any conceivable basis exists for its implementation.
To exclude from the generally applicable grievance procedures those employees who serve in a supervisory capacity might readily be justified under the standard just recited. As in any enterprise, there is within the context of government *Page 6 
service a paramount interest in preserving the confidentiality of certain communications between managerial employees and their subordinates. At a general level, this interest is reflected, for instance, in section 2 of the Memorandum, which excludes from the grievance procedure applicable to any employee, including both managers and their subordinates, "[c]omplaints about performance evaluations," which section 2 of the Memorandum identifies as subject to a distinct, presumably non-public grievance procedure.[2] At the managerial level, there is a strong concern that both the assessment of supervisors' performance and any consideration of their grievances be marked above all by candor in the process of review — a priority strongly served by an assurance of confidentiality in communications. This need for frankness and discretion in the review of upper-echelon employees extends not only to their supervision of subordinates, but also to all other aspects of their performance — a fact that warrants applying to such employees a review procedure that differs from that applicable to employees in general. This consideration doubtless accounts for the fact that section 1 of the Memorandum excludes from the standard grievance procedure only what appear to be upper-level employees of the agency.
It is likewise easy to conceive of a defensible reason why employees who are subject to licensure should be subject to a different process of review than other employees. Perhaps most prominent within the list of individuals excluded from the standard process of grievance review are attorneys and their supervisors. In their dealings with clients, such individuals will inevitably develop and consider information that is subject to the attorney-client privilege. Although such information may obviously bear directly on a grievance involving an attorney and his or her supervisors, such information must just as obviously be shielded from *Page 7 
any disclosure. This consideration alone would appear to warrant dealing with grievances related to the handling of legal matters in a manner that differs from the approach taken in other contexts. Similar reasoning would apply to the conduct of licensed individuals who are privy to confidential information such as privileged financial records.
You have not asked, and I am not situated to address, whether the grievance procedures actually adopted by DFA reasonably accommodate the differing priorities related to grievances involving the different classes of employees discussed above. Indeed, based upon the information provided me, I am unaware of what those procedures currently are. Not being a finder of fact, I do not know precisely how what you term the "uniform grievance and alternative dispute resolution procedures" actually operate as applied to employees who are not supervisors or licensed professionals. I likewise do not know precisely how DFA handles grievances involving managers and licensed professionals. Accordingly, the foregoing is meant to establish only that a conceivable rational basis exists for establishing different types of procedures to handle grievances involving these two categories of employees — a conclusion that should suffice to establish that DFA's drawing the distinction should survive an equal protection challenge.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
DM:JHD/cyh
[1] With respect to what I consider the clear authority of a governor to issue an executive order requiring and providing guidelines for the monitoring of executive-agency grievance procedures, see Ark. Op. Att'y Gen. No. 98-105 (discussing in detail the scope of the governor's "supreme executive power" in issuing executive orders under Ark. Const. art. 6, § 2).
[2] Although the Memorandum does not address whether the review of a grievance at the agency level will normally involve any sort of public hearing, the existence of a separate grievance procedure to address complaints about employee evaluations suggests an agency priority on maintaining privacy regarding such grievances. In this regard, I will note that section (9) of EO 93-01 directs that hearings before the Panel, which provides an avenue for appeal from certain determinations not excluded from the general procedure set forth in the Memorandum, be conducted publicly — a fact that would obviously undermine the agency's legitimate concern for privacy regarding employee-evaluation grievances. With regard to maintaining the privacy of employee evaluations, compare the provision of the Arkansas Freedom of Information Act barring the disclosure of employee evaluation/job performance records unless there has been a "final administrative resolution of any suspension or termination proceeding at which the records form a basis for the decision to suspend or terminate the employee and . . . there is a compelling public interest in their disclosure." A.C.A. § 25-19-105(c)(1)[A]11 (Supp. 2009). As noted in Ark. Op. Att'y Gen. No. 2009-210, this exemption "promotes candor in a supervisor's evaluation of an employee's performance with a view toward correcting any deficiencies. See J. Watkins R. Peltz, The Arkansas Freedom of Information Act (mm Press, 4th ed. 2004), at 196." *Page 1